**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                        No. CR 13-2869 JB

ALDO JONES,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Petition for Revocation of Supervised Release, filed June 10, 2019 (Doc. 115)("Petition").  The Court held a revocation hearing on May 14, 2020, and evidentiary revocation hearings on June 15, 2020, and June 26, 2020.  <u>See</u> Violation of Supervision Proceedings Minute Sheet at 1, filed May 14, 2020 (Doc. 137); Notice of Hearing on June 15, 2020, filed June 4, 2020 (Doc. 138)(text-only entry); Clerk's Minutes at 1, filed June 26, 2020 (Doc. 144).  The primary issues are: (i) whether the preponderance of the evidence supports that Defendant Aldo Jones' conduct -- stabbing and killing a man outside a fast-food restaurant -- constitutes voluntary manslaughter under New Mexico law, such that A. Jones violated the supervised release condition that he not commit a federal, state, or local crime; (ii) whether the preponderance of the evidence supports that A. Jones' conduct constitutes a crime of violence under § 4B1.2(a) of the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines"), which defines crime of violence as including voluntary manslaughter and not involuntary manslaughter, even though A. Jones pled no contest to involuntary manslaughter in State court; (iii) whether the preponderance of the evidence supports that A. Jones' conduct amounts to a Grade A Violation or a Grade B Violation under § 7B1.1(a) of the Guidelines; and

(iv) whether the preponderance of the evidence supports that A. Jones' conduct and the surrounding circumstances satisfy the elements that are required to establish that A. Jones acted in self-defense when he stabbed another person. The Court concludes that: (i) the preponderance of the evidence establishes that A. Jones' conduct constitutes voluntary manslaughter under New Mexico law, because A. Jones acted in response to sufficient provocation, and because he possessed voluntary manslaughter's requisite mens rea -- knowledge that his act would create a strong probability of death or great bodily harm -- and, thus, A. Jones violated a supervised release condition by engaging in conduct that amounts to a crime under New Mexico law; (ii) the preponderance of the evidence establishes that A. Jones' conduct constitutes a crime of violence under the Guidelines, because § 4B1.2(a) defines crime of violence as including voluntary manslaughter; (iii) the preponderance of the evidence establishes that A. Jones committed a Grade A Violation under the Guidelines, because § 7B1.1(a)'s definition for Grade A Violations includes any state offense that is punishable for a term of imprisonment exceeding one year and that is a crime of violence, and voluntary manslaughter under New Mexico law satisfies both criteria; and (iv) the preponderance of the evidence establishes that A. Jones' self-defense argument is inadequate under New Mexico law, because A. Jones' conduct -- stabbing and killing a man who chased him with an umbrella -- is an excessive use of force, and because a reasonable person under the same circumstances would not have acted similarly. Accordingly, because A. Jones committed a Grade A Violation and has a criminal history category of III, the Guidelines recommend a range of 18 to 24 months imprisonment.

## FINDINGS OF FACT

The Court held a two-day evidentiary hearing on the revocation of supervised release. The Court makes the following findings of fact related to the issues. Rule 12(d) of the Federal Rules

of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. In making these findings, the Court does not consider any evidence or testimony from the hearing that violates the test that the United States Court of Appeals for the Tenth Circuit adopted in United States v. Jones, 818 F.3d 1091, 1098 (10th Cir. 2016). See United States v. Hernandez, 428 F. Supp. 3d 775, 788 (D.N.M. 2019)(Browning, J.)("When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness." (citing United States v. Jones, 818 F.3d at 1098)). Accordingly, the Court finds:

1.      In the late afternoon on July 28, 2013, in Indian Country within the District of New Mexico, A. Jones "employed a screwdriver," by "dedicating the screwdriver to [the victim's] right hand, left shoulder and head," and, about two hours later, A. Jones "stabbed [another victim] with a knife." Plea Agreement ¶¶ 10, 12, at 4-5, filed December 4, 2013 (Doc. 37). See Draft Transcript of Evidentiary Hearing at 7:13-16 (held June 15, 2020)(Towne)("June 15 Tr.").[1]

2.      On December 4, 2013, A. Jones pled guilty in federal court to two counts of assault resulting in bodily injury, see 18 U.S.C. §§ 1153 and 113(a)(6), and two counts of assault with a dangerous weapon with intent to do bodily harm, see 18 U.S.C. §§ 1153 and 113(a)(3); Plea Agreement ¶ 7, at 3; Indictment at 1-2, filed August 27, 2013 (Doc. 21).

---

[1]The Court's citations to the transcripts of each hearing in this case refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

3.     On May 8, 2014, the Honorable M. Christina Armijo, then-Chief United States District Judge for the United States District Court for the District of New Mexico, sentenced A. Jones to seventy months imprisonment for each count, with each term running concurrently. See Sentencing Minute Sheet at 1, filed May 8, 2014 (Doc. 52).

4.     Chief Judge Armijo also sentenced Aldo to three years of federal supervised release for each count, with each term running concurrently. See Sentencing Minute Sheet at 1.

5.     On September 7, 2018, A. Jones was released from prison and began serving a three-year term of supervised release. See Judgment in a Criminal Case at 3, filed May 19, 2014 (Doc. 55)("Judgment"); Judgment in a Criminal Case at 3; Defendant's Supervised Release Sentencing Memorandum ¶ 1, at 1-2, filed May 13, 2020 (Doc. 134)("Jones Sentencing Memo"); June 15 Tr. at 14:6-7 (Snyder, Towne).

6.     After A. Jones' release from prison in September, 2018, A. Jones first lived at Diersen Charities, a residential re-entry center in Albuquerque, New Mexico, and then A. Jones lived with sister until he was able to provide for his own living accommodations. See June 15 Tr. at 14:10-12 (Towne).

7.     During A. Jones' time at Diersen Charities, A. Jones received counseling, and he stayed "in compliance with counseling"; A. Jones never tested positive for drugs or alcohol, and he "was able to find a pretty good job." June 15 Tr. at 14:13-25 (Snyder, Towne).

8.     When A. Jones was released from prison, Jason Towne, a United States Probation Officer who started supervising A. Jones in September, 2018, had no reason to believe that A. Jones would not transition successfully into the community. See June 15 Tr. at 15:9-17 (Snyder, Towne).

9.      On June 7, 2019, A. Jones awoke at 5:00 a.m. to go to work, and, when he got off from work at 3:00 p.m., he bought three sixteen-ounce cans of Budweiser beer on his way home with a co-worker.  See June 15 Tr. at 63:13-65:6 (Snyder, A. Jones).

10.     It is a violation of A. Jones' federal supervised release conditions to drink alcohol, and A. Jones has violated this condition and admitted his violation to his probation officer.  See June 15 Tr. at 102:15-24 (Nayback, A. Jones).

11.     When A. Jones got home, a friend invited him to go to a casino, which A. Jones decided he would do later that evening, because he first needed to wait for his brother, Eddie Jones, to come "back from work."  June 15 Tr. at 65:14-15 (A. Jones).

12.     E. Jones came to A. Jones' home around 3:30 p.m., relaxed, and drank some of the beer that A. Jones had bought.  See June 15 Tr. at 65:15-66:10 (Snyder, A. Jones).

13.     Around 7:50 p.m., A. Jones and E. Jones decided to get dinner, but A. Jones said that he owed E. Jones money, so they first walked to Circle K, a convenience store, to use an ATM to get cash.  See June 15 Tr. at 66:13-67:12 (Snyder, A. Jones).

14.     After they got cash, A. Jones and E. Jones decided to go to Sonic, a drive-in, fast-food restaurant, for dinner, so they crossed the street, and, after walking about forty yards, they encountered two women and two or three men in a heated confrontation.  See June 15 Tr. at 67:14-68:5 (Snyder, A. Jones).

15.     The Sonic is in a part of Albuquerque known as the "War Zone," "because there are gangs, high violence, [and] drugs."  June 15 Tr. at 78:11-17 (A. Jones).

16.     Albuquerque's "War Zone" -- also known as the "International District" -- is a neighborhood in southeast Albuquerque with prevalent poverty and a high crime rate, and it is "bounded by San Mateo Boulevard on the west, Wyoming Boulevard on the east, Lomas

Boulevard on the north and Kirtland Air Force Base on the south." Leslie Linthicum, "Children in an Albuquerque neighborhood dubbed 'the War Zone' face an onslaught of risk factors," Santa Fe New Mexican (Feb. 18, 2018), https://www.santafenewmexican.com/news/local_news/ children-in-an-albuquerque-neighborhood-dubbed-the-war-zone-face-an-onslaught-of-risk-factors/article_1e5a300b-464c-5cdb-9f7e-e25f51404463.html (last visited July 25, 2020).

17.     At 8:21 p.m., A. Jones and E. Jones approached one of the unknown women -- who had dark hair, wore a white shirt, and carried a long, thin umbrella -- while walking along the sidewalk in front of Sonic located near Central Boulevard and San Pedro Drive SE in Albuquerque. See Sonic Surveillance Video (West) at 03:04-03:10 (dated June 7, 2019), filed June 10, 2020 (Doc. 140 Ex. 1)("Sonic West Video").

18.     The umbrella was between approximately twenty and a little over twenty-four inches long. See June 15 Tr. at 36:4-5 (Snyder, Lucero); id. at 37:11-12 (Lucero).

19.     A. Jones wore a dark blue hoodie with short sleeves and gray plaid shorts, and E. Jones wore a dark green shirt and black, baggy pants. See Date of incident picture of Aldo Jones, filed June 10, 2020 (Doc. 140 Ex. 5); Date of incident picture of Eddie Jones, filed June 10, 2020 (Doc. 140 Ex. 6).

20.     A. Jones, E. Jones, and the unknown woman stopped on the sidewalk, and they faced each other while standing within reaching distance. See Sonic West Video at 03:22-03:24.

21.     The unknown woman hit A. Jones. See Sonic West Video at 03:24-03:29.

22.     John Paul Chavez, who was wearing a white shirt, a red cap, red shorts, and red shoes, walked toward A. Jones, E. Jones, and the unknown woman. See Sonic West Video at 03:29-03:35.

23.     A. Jones, E. Jones, and the unknown woman backed up, but they remained on the sidewalk, barely out of reaching distance.  <u>See</u> Sonic West Video at 03:36-03:37.

24.     The unknown woman and the three men talked to each other while moving their hands, A. Jones then started walking away by heading west on the sidewalk, and he eventually moved outside the Sonic West Video camera's frame.  <u>See</u> Sonic West Video at 03:37-03:47.

25.     A. Jones walked away from the verbal altercation between the unknown woman and E. Jones, <u>see</u> June 15 Tr. at 122:6-8 (DiVasto), which indicates that A. Jones "was disengaging," June 15 Tr. at 122:11-12 (DiVasto).

26.     The unknown woman started "calling [A. Jones] names," which he ignored, but when he turned around, he saw the woman "pointing her fingers to [E. Jones'] face."  June 15 Tr. at 68:30-69:6 (A. Jones).

27.     Once Chavez reached E. Jones and the unknown woman, the group remained on the sidewalk to talk to each other within reaching distance, along with another unknown man wearing dark clothing.  <u>See</u> Sonic West Video at 03:48-03:58.

28.     While E. Jones, Chavez, the unknown woman, and the unknown man remained on the sidewalk, Central Boulevard experienced steady traffic.  <u>See</u> Sonic West Video at 03:48-03:58.

29.     After Chavez joined the group, A. Jones turned around and returned to the group. <u>See</u> Sonic West Video at 03:59-4:02.

30.     A. Jones approached from the west on the sidewalk along Central Boulevard toward the group of people, and Chavez approached from the east on the sidewalk.  <u>See</u> Sonic West Video at 03:59-4:02.

31.     The five individuals remained on the sidewalk within several feet of one another and appeared to talk to each other while waving their hands and arms.  See Sonic West Video at 4:05-4:35.

32.     A. Jones tried to distance himself from Chavez and the unknown woman, but Chavez and the unknown woman blocked A. Jones and E. Jones from moving.  See June 15 Tr. at 44:13-46:22 (Snyder, Lucero).

33.     The unknown woman still held an umbrella, and she walked around A. Jones while holding the umbrella up in the air.  See Sonic West Video at 04:36-04:41.

34.     With the umbrella raised in the air, the unknown woman walked closer toward A. Jones, and the entire group headed west on the sidewalk toward A. Jones and the unknown woman.  See Sonic West Video at 04:41-04:46.

35.     The unknown woman swung the umbrella at A. Jones, who ducked to avoid being hit.  See Sonic West Video at 04:47-04:50; June 15 Tr. at 70:14-16 (A. Jones).

36.     The unknown woman did not try to disengage from the situation, tried to poke A. Jones and E. Jones with the umbrella, and blocked their exit path on several occasions.  See June 15 Tr. at 123:6-14 (DiVasto, Snyder).

37.     E. Jones and Chavez started heading west along the sidewalk, while the unknown woman followed them, and she swung the umbrella at Chavez.  See Sonic West Video at 04:52-04:58; Cell Phone Video Clip from Witness Adam Apodaca at 00:02-00:04 (dated June 7, 2019), filed June 10, 2020 (Doc. 140 Ex. 4)("Apodaca Witness Video").

38.     Chavez took the umbrella from the unknown woman, and he followed A. Jones and E. Jones, who all started heading east along the sidewalk.  See Sonic West Video at 05:00-05:08; Apodaca Witness Video at 00:09-00:11.

39.     Chavez "tried to come at [A. Jones and E. Jones]," at which point A. Jones pushed

E. Jones behind him and again told Chavez that they do not want any problems, but Chavez became

"more aggressive," and A. Jones said he offered to buy the group of people drinks.  June 15 Tr.

at 72:4-5 (A. Jones).

40.     Chavez could have injured A. Jones' eyes with the umbrella, so A. Jones jumped

back every time Chavez swung the umbrella at him.  See June 15 Tr. at 98:11-25 (Nayback,

A. Jones).

41.     A. Jones thought that Chavez might be on drugs.  See June 15 Tr. at 99:8-10

(A. Jones).

42.     A. Jones tried running across Central Boulevard to escape, and his attempted retreat

was in the camera's "blind spot."  June 15 Tr. at 74:2 (A. Jones).  See id. at 72:18-20 (A. Jones);

id. at 73:21-74:10 (A. Jones, Snyder).

43.     A. Jones and E. Jones headed east along the sidewalk, and they moved outside the

Sonic West Video camera's frame.  See Sonic West Video at 05:18-05:20.

44.     The unknown woman followed A. Jones and E. Jones, and she also moved outside

the Sonic West Video camera's frame.  See Sonic West Video at 05:18-05:20.

45.     Chavez, the unknown man wearing black, and a newly arrived person wearing

white slowly followed A. Jones, E. Jones, and the unknown woman.  See Sonic West Video

at 05:20-05:30.

46.     Of the people following A. Jones and E. Jones, A. Jones testified that one man had

a cane that he swung at A. Jones, and a small woman had a knife.  See June 15 Tr. at 74:5-10

(A. Jones); id. at 75:12-17 (A. Jones).

47.     E. Jones also had a knife, which A. Jones says he took away from E. Jones "to let [the other people] know that we're not trying to pose a threat or anything like that" and "to diffuse [the] situation."  June 15 Tr. at 76:11-16 (A. Jones).

48.     A. Jones did not come to Sonic with a knife.  See June 15 Tr. at 20:11-21 (Towne); id. at 51:15-53:3 (Snyder, Lucero).

49.     The group of people never reappeared within the Sonic West Video camera's frame. See Sonic West Video 05:30-13:50.

50.     After a little over a minute, a man wearing a black shirt and jeans walked along the fence around the Sonic and crossed Central Boulevard.  See Sonic West Video at 06:40-06:46.

51.     A. Jones and E. Jones continued to walk away, but the group of people kept following after them.  See June 15 Tr. at 77:3-6 (A. Jones).

52.     A. Jones and E. Jones tried to flee the scene, and they "made attempts at de-escalation that did not happen to work."  June 15 Tr. at 117:18-19 (DiVasto).

53.     A. Jones, E. Jones, the unknown woman -- who now had a backpack that is visible in the video footage -- and Chavez ran quickly, in the order listed, around the Sonic' rear east side toward a set of trash and recycling dumpsters near an alleyway.  See Sonic Surveillance Video (East) at 00:20-00:25 (dated June 7, 2019), filed June 10, 2020 (Doc. 140 Ex. 2)("Sonic East Video").

54.     Chavez "was running in the same direction as Mr. Jones and his brother," and he carried the umbrella in his hand.  June 15 Tr. at 31:8-9 (Lucero).  See id. at 31:14-15 (Lucero).

55.     Chavez chased A. Jones, and Chavez was holding the umbrella "in the air."  June 15 Tr. at 79:11-12 (A. Jones).

- 10 -

56.     People shouted during the incident: "Fuck him, get him, fuck him, get him." June 15 Tr. at 19:22 (Snyder).  See id. at 19:24 (Towne); id. at 77:13-14 (A. Jones).

57.     When Chavez approached A. Jones, A. Jones heard someone yelling "shoot him," and he did not contemplate whether his actions violated his supervised release conditions.  See June 15 Tr. at 107:8-12 (Snyder, A. Jones).

58.     When Chavez approached A. Jones' side, A. Jones was "afraid [Chavez] was going to block his flight from that scene."  June 15 Tr. at 118:1-2 (DiVasto).

59.     A. Jones held a knife in his hand, and Chavez held an umbrella.  See June 15 Tr. at 12:5-16 (Nayback, Towne).

60.     The group of people ran up to the dumpsters, and, when Chavez' back faced the dumpsters and A. Jones' back faced the open air, A. Jones took several steps toward Chavez and stabbed him using the knife that A. Jones took from E. Jones, which caused Chavez to fall to the ground at the foot of the trash dumpster.  See Sonic East Video at 00:26-00:30; June 15 Tr. at 12:1-4 (Towne); id. at 13:3-8 (Towne); Cell Phone Video Clip from witness Brittany Bridges at 00:00-00:01 (dated June 7, 2019), filed June 10, 2020 (Doc. 140 Ex. 3)("Bridges Witness Video").

61.     A. Jones held the knife like he "was cutting some potatoes," and he used the knife out of "fear" and in an effort to "get away."  June 15 Tr. at 91:24-92:8 (A. Jones, Nayback).

62.     A. Jones feared for his life, because he did not know if one of the people following him had a gun.  See June 15 Tr. at 101:12-102:1 (A. Jones, Nayback).

63.     Being outnumbered was a contributing factor to A. Jones responding in the moment by using force.  See June 15 Tr. at 127:3-10 (Snyder, DiVasto).

64.     The unknown woman, the unknown man wearing black, and the unknown person wearing white ran closer toward Chavez.  <u>See</u> Sonic East Video at 00:28-00:35; Bridges Witness Video at 00:01-00:04.

65.     The unknown woman started jumping in the air, and Chavez stood up.  <u>See</u> Sonic East Video at 00:34-00:37; Bridges Witness Video at 00:04-00:07.

66.     One of the men who followed A. Jones reached for something near his belt, and A. Jones was afraid that the man had a gun.  <u>See</u> June 15 Tr. at 80:5-81:1 (A. Jones, Snyder).

67.     Chavez ran away from the dumpsters and the group of people, and, after a few seconds, he fell face-forward to the ground.  <u>See</u> Sonic East Video at 00:38-00:41; Bridges Witness Video at 00:06-00:10.

68.     A. Jones and E. Jones ran in the opposite direction from Chavez -- around the dumpsters and down the nearby alleyway -- and the group of people, except for Chavez, followed A. Jones and E. Jones.  <u>See</u> Sonic East Video at 00:42-00:57; June 15 Tr. at 81:8 (A. Jones).

69.     The unknown woman grabbed the umbrella and ran down the alleyway.  <u>See</u> Sonic East Video at 00:56-00:58; Bridges Witness Video at 00:17-00:18.

70.     The entire group of people, except for Chavez, disappeared from the Sonic East Video camera's frame soon after running down the alleyway.  <u>See</u> Sonic East Video at 1:00-1:05.

71.     Shortly after A. Jones and E. Jones ran down the alleyway, a police officer pulled up to A. Jones and E. Jones and "shined his lights."  June 15 Tr. at 81:19-20 (A. Jones).

72.     The police officer told A. Jones and E. Jones to stop, get on the ground, and put their hands in the air, and, as the police officer exited the vehicle, A. Jones "pushed the knife aside," because he did not "want to get caught holding the knife."  June 15 Tr. at 81:25-82:1 (A. Jones).

73.     A. Jones did not want to get caught holding the knife, because he did not want the police officer to shoot him.  See June 15 Tr. at 103:14-16 (Nayback, A. Jones).  See id. at 102:14 (A. Jones).

74.     The police officer held A. Jones and E. Jones in the back of a police vehicle for hours and interrogated A. Jones at around 3:20 a.m.  See June 15 Tr. at 82:23-83:11 (Snyder, A. Jones).

75.     Chavez remained on the ground and moved his head slightly, while a man who wore white, a man who wore black, and a woman who wore black approached him.  See Sonic East Video at 1:06-1:20; Bridges Witness Video at 00:13-00:16.

76.     The man wearing black touched Chavez' back.  See Sonic East Video at 1:19-1:21.

77.     Several people with cellular telephones appeared within the Sonic East Video camera's frame, and a black and red sedan pulled into the parking lot from the alleyway.  See Sonic East Video at 1:25-1:28.

78.     The sedan's driver -- a man wearing a black shirt and orange shorts -- exited the sedan and approached Chavez.  See Sonic East Video at 1:40-1:42.

79.     Chavez did not move, remained face-down on the pavement, and blood began to stream on the pavement around his body.  See Sonic East Video at 1:40-45.

80.     The man wearing a black shirt turned Chavez onto his side, and a large amount of blood drenched Chavez' white shirt.  See Sonic East Video at 1:47-1:50.

81.     Chavez did not move for the remainder of the Sonic East Video's footage.  See Sonic East Video at 1:50-3:29.

82.     The man wearing a black shirt and orange shorts turned Chavez onto his back.  See Sonic East Video at 2:06-2:14.

83.     The man wearing a black shirt and orange shorts placed a white cloth on Chavez' chest to cover the blood, and he applied pressure to the Chavez' chest.  See Sonic East Video at 2:50-03:29.

84.     About three-and-a-half minutes after the group of people disappeared from the Sonic West Video camera's frame, a police car with flashing lights on its top headed east along Central Boulevard.  See Sonic West Video at 09:02-09:04.

85.     The vehicular traffic heading east along Central Boulevard started to increase.  See Sonic West Video at 09:10-09:52.

86.     At 8:29 p.m., a fire truck with flashing lights pulled up in front of Sonic and parked alongside the sidewalk.  See Sonic West Video at 10:56-11:00.

87.     A police car with flashing lights pulled up behind the fire truck.  See Sonic West Video at 11:01-11:07.

88.     The police car with the flashing lights then pulled into the Sonic parking lot and disappeared from the Sonic West Video camera's frame.  See Sonic West Video at 11:16-11:20.

89.     A second police car with flashing lights pulled into the Sonic parking lot and disappeared from the Sonic West Video camera's frame.  See Sonic West Video at 12:30-12:35.

90.     Two additional police cars pulled up behind the fire truck and parked along the sidewalk.  See Sonic West Video at 12:40-12:55.

91.     Jose Lucero, a detective for the Albuquerque Police Department ("APD"), investigated the incident and described his investigation:

> On June 7, 2019 I was called at around 21:15 hours, 9:15 p.m. . . . to the Sonic at 6320 Central Avenue, Southeast, in reference to a stabbing call. Uniformed officers were dispatched there initially about an hour prior to that in reference to the same call.  When I arrived on scene, I was told there were approximately three witnesses that were somewhat involved in rendering aid to the

victim.  One of them was identified as Brittany Bridges.  The other two gentlemen were identified as Gabriel Mauldin and Llan Tena.  Those two gentlemen were traveling together in the same car.  Those folks remained on scene and waited to be interviewed by detectives.  When I arrived on scene obviously the victim . . . was still there.  He had been pronounced deceased.  At the time we didn't know exactly what had happened to him.  But based on the call and what witnesses were saying or telling uniformed officers prior to my arrival the victim had been stabbed.

June 15 Tr. at 25:8-26:6 (Lucero).  See Investigation Report from Det. Lucero (dated June 27, 2019), filed June 10, 2020 (Doc. 140 Ex. 12)("Lucero Investigation Report").

92.    After the incident, A. Jones agreed to give a brief statement to Lucero, which included the following:

Basically I asked him to run me through the events of what had transpired that evening.  He stated he and his brother were trying to go I believe was trying to get something to drink from the Circle K which is just west of the [Sonic] in this case.  I believe he told me that at the remembered someone being involved in an altercation at that point.  He didn't indicate whether it was him or his brother.  And that the people that were involved in that altercation would not let him and his brother [p]ass to go through to the [C]ircle K.  At that point had indicated to me that these people tried to jump him which in my opinion meant that they were trying to batter him and his brother, and at that point they retreated to the east side of the Sonic.

June 15 Tr. at 32:4-18 (Lucero).  See Transcript of Defendant's custodial interrogation with Det. Lucero on the date of incident (dated June 8, 2019), filed June 10, 2020 (Doc. 140 Ex. 13-1)("Lucero Interview Tr.").

93.    Although A. Jones denied being involved in any physical altercation, A. Jones told Lucero that he acted in self-defense when Chavez and others chased him.  See June 15 Tr. at 34:25-35:10 (Snyder, Lucero); id. at 87:23-25 (A. Jones).

94.    A. Jones did not know if he stabbed or punched Chavez, but A. Jones "knew he had encountered [Chavez] physically," and A. Jones "was surprised to hear he had stabbed him."  June 118:5-8 (DiVasto).

- 15 -

95.     A. Jones told Lucero that the people chasing him had an umbrella, a cane, and knives.  See June 15 Tr. at 105:19-20 (A. Jones).

96.     Chavez and the unknown woman with the umbrella were the initial aggressors, and A. Jones did not plan the physical altercation.  See June 15 Tr. at 39:7-40:1 (Snyder, Lucero).

97.     A. Jones did not escalate the situation.  See June 15 Tr. at 122:23-24 (DiVasto).

98.     Leading up to the stabbing, A. Jones did not display aggression toward Chavez and the unknown woman.  See June 15 Tr. at 126:4-6 (Snyder, DiVasto).

99.     A. Jones and E. Jones were outnumbered during the altercation.  See June 15 Tr. at 41:21-22 (Snyder, Lucero).

100.     According to Chavez' autopsy and pathology report, Chavez suffered "an injury to the upper right portion of his lung, and straight through the aorta."  June 15 Tr. at 26:19-20 (Lucero).

101.     The video footage is the best evidence in this case, and the three witnesses "never identified [A. Jones] as being the person who stabbed the victim."  June 15 Tr. at 28:17-18 (Lucero).

102.     While one witness said that A. Jones "was involved" in the altercation, "all three" witnesses "couldn't identify [A. Jones] as being the person who stabbed the victim."  June 15 Tr. at 30:3-8 (Lucero).

103.     APD officers took A. Jones and E. Jones into custody "based on the description that" the witnesses gave Lucero.  June 15 Tr. at 29:19-20 (Lucero).

104.     Chavez' toxicology report discloses that Chavez' blood contained traces of the following substances: methamphetamine, amphetamine, ephedrine, methadone, morphine,

hydrocodone, THC,[2] and fentanyl, all of which are illegal without a prescription.  See June 15 Tr. at 56:6-57:1 (Snyder, Lucero); Victim's Toxicology report from the Office of the Medical Investigator at 1-2 (dated November 2, 2019), filed June 10, 2020 (Doc. 140 Ex. 7)("Chavez Toxicology Report").

105.    Law enforcement could not identify or locate the unknown individuals who participated in the altercation.  See June 15 Tr. at 48:3-7 (Snyder, Lucero).

106.    The only weapon that law enforcement obtained from the scene is the knife that A. Jones used to stab Chavez.  See June 15 Tr. at 50:13-20 (Snyder, Lucero).

107.    On June 7, 2019, the United States Probation Office ("USPO") alleged that A. Jones committed murder under New Mexico law and therefore violated a condition of his supervised release: "You must not commit another federal, state, or local crime."  Petition at 1.

108.    The State of New Mexico charged A. Jones with murder, a state Grand Jury indictment reduced A. Jones' charges to state voluntary manslaughter, and Jones ultimately pled no contest to state involuntary manslaughter.  See June 15 Tr. at 7:24-8:4 (Towne); id. at 83:17-84:1 (Snyder, A. Jones).

109.    A. Jones was held in custody from June 7, 2019, to December 27, 2019, when he pled no contest to involuntary manslaughter.  See June 15 Tr. at 83:12-16 (Snyder, Jones); New Mexico v. Jones, D202CR201902021 (2d Judicial District Court, County of Bernalillo, State of New Mexico)(docket entry indicating that, on December 27, 2019, A. Jones pled no contest to involuntary manslaughter, which is "lesser to the charge to [the] indictment").

---

[2]THC, or tetrahydrocannabinol, "is the chief intoxicant in marijuana."  THC, Merriam-Webster, https://www.merriam-webster.com/dictionary/THC (last visited July 29, 2020).

- 17 -

110.    A. Jones accepted the state court plea, even though he contends that he acted in self-defense.  See June 15 Tr. at 85:12-16 (Snyder, A. Jones).

111.    Dr. Pete DiVasto is an "expert of psychology" for "reviewing use of force situations and high stress and rapidly unfolding encounters."  June 15 Tr. at 108:8-10 (Snyder).

112.    Dr. DiVasto interviewed A. Jones for somewhere between ninety minutes and two hours.  See Draft Transcript of Evidentiary Hearing at 6:22-25 (held June 26, 2020)(Nayback, DiVasto)("June 26 Tr.").

113.    "[W]hen officers and deputies get involved in officer involved shootings, departments have found it helpful to send them for some sort of psychological debriefing afterwards to help them deal with the [consequences] of a shooting."  June 15 Tr. at 110:14-19 (DiVasto).

114.    During short, high-stress encounters, people are "less able . . . to formulate a plan [and] less able . . . to incorporate what's happened and deal with it and come up with alternatives perhaps."  June 15 Tr. at 128:4-6 (DiVasto).

115.    It is often more difficult to de-escalate a tense situation involving a person who is under the influence of drugs or alcohol.  See June 15 Tr. at 57:8-11 (Snyder, Lucero).

116.    Compared to a layperson, "a trained person perceives many more variables in [high-stress] encounters.  They're very much able to control their reaction to them."  June 15 Tr. at 130:22-24 (DiVasto).

117.    Some of the "variables" that impact how a person responds in a high-stress encounter include "things like proximity, threat, ability of the threat to be carried out, intervening variables like would anybody else be harmed if I use deadly force in this situation. . . .   And

- 18 -

[people] have to incorporate all this information instantly when these things happen." June 15 Tr. at 131:2-9 (DiVasto).

118.    When most people are confronted with a high-stress situation with few options for responding, "they focus on the threat.  And may not see other choices or other external inputs." June 15 Tr. at 130:11-12 (DiVasto).

119.    The fast-paced encounter, the lack of time to consider alternative actions, and "the threat [posed by Chavez] coming in peripherally from the side made it more difficult [for A. Jones] to assess" the situation.  June 15 Tr. at 132:19-21 (DiVasto).

120.    Dr. DiVasto is self-employed, has a private business, charges $200.00 to review records, and charges $400.00 an hour for testimony and depositions.  See June 15 Tr. at 138:12-22 (Nayback, DiVasto).

121.    Psychology is an academic discipline concerning "[i]ntangibles such as thought and feelings." June 26 Tr. at 4:22 (DiVasto).

122.    New Mexico law defines manslaughter as "the unlawful killing of a human being without malice." N.M. Stat. Ann. § 30-2-3.

123.    Under New Mexico law, "[v]oluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." N.M. Stat. Ann. 30-2-3(A).

124.    Under New Mexico law, "[i]nvoluntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection." N.M. Stat. Ann. 30-2-3(B).

125.    Under New Mexico law, voluntary manslaughter is a third-degree felony, <u>see</u> N.M. Stat. Ann. § 30-2-3(A), and third-degree felonies resulting in the death of a human being are punishable by six years imprisonment, <u>see</u> N.M. Stat. Ann. § 31-18-15(A)(6).

126.    Under New Mexico law, involuntary manslaughter is a fourth-degree felony, <u>see</u> N.M. Stat. Ann. § 30-2-3(B), and fourth-degree felonies are punishable by eighteen months imprisonment, <u>see</u> N.M. Stat. Ann. § 31-18-15(A)(9).

127.    New Mexico's Criminal Uniform Jury Instructions for voluntary manslaughter require the State to prove that: (i) the defendant killed the victim; (ii) the "defendant knew that his acts created a strong probability of death or great bodily harm" to the victim or another human being; (iii) the "defendant acted as a result of sufficient provocation"; and (iv) the act happened in New Mexico.  N.M. R. Ann. Crim. U.J.I. 14-221.

128.    New Mexico's Criminal Uniform Jury Instructions define sufficient provocation:

> Sufficient provocation can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions.  The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition.  The "provocation" is not sufficient if an ordinary person would have cooled off before acting.

N.M. R. Ann. Crim. U.J.I. 14-222.

129.    New Mexico's Criminal Uniform Jury Instructions for involuntary manslaughter require the State to prove that the defendant: (i) "should have known of the danger involved by [the defendant's] actions"; and (ii) "acted with a willful disregard for the safety of others."  N.M. R. Ann. Crim. U.J.I. 14-231.

130.    The relevant factors that distinguish a Grade A Violation from a Grade B Violation are that the former applies only if a defendant's conduct constitutes: (i) "a crime of violence"; (ii)

"a controlled substance offense"; or (iii) an offense "involv[ing] possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a)."  U.S.S.G. § 7B1.1(a)(1).

131.    The Guidelines define "crime of violence":

(a)    The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that --

(1)    has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2)    is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a).

132.    Under New Mexico law, A. Jones' conduct constitutes an offense that is punishable by an imprisonment term exceeding one year, and, thus, A. Jones' violation is not a Grade C Violation.  See N.M. Stat. Ann. § 30-2-3(A)-(B); N.M. Stat. Ann. § 31-18-15(A)(6), (9).

133.    Voluntary manslaughter is a crime of violence, and, thus, it is a Grade A Violation under the Guidelines.  See U.S.S.G. §§ 4B1.2(a)(2); U.S.S.G. § 7B1.1(a)(1).

134.    A. Jones' conduct constitutes voluntary manslaughter, because A. Jones unlawfully killed Chavez, because the group of people chasing A. Jones and E. Jones sufficiently provoked A. Jones to act in a heat of passion, and because A. Jones intended to disable Chavez by stabbing him.  See N.M. Stat. Ann. § 30-2-3(A); Sells v. State, 1982-NMSC-125, ¶ 5, 653 P.2d 162, 163; State v. Abeyta, 1995-NMSC-051, ¶ 15, 901 F.2d 164, 177; State v. Beach, 1985-NMSC-043, ¶ 11, 699 P.2d 115, 117.

135.    Because A. Jones' conduct constitutes voluntary manslaughter, which is a crime of violence under the Guidelines, A. Jones committed a Grade A Violation.   See U.S.S.G. §§ 4B1.2(a)(2); U.S.S.G. § 7B1.1(a)(1).

## PROCEDURAL BACKGROUND

On December 4, 2013, A. Jones pled guilty to two counts of assault with a dangerous weapon within Indian country and two counts of assault resulting in serious bodily injury within Indian Country.   See Indictment at 1-2; Plea Agreement at 11; FOF ¶ 2, at 3-4.   On May 8, 2014, Chief Judge Armijo sentenced A. Jones to seventy months imprisonment for each count, with each term running concurrently.   See Sentencing Minute Sheet at 1; FOF ¶ 3, at 4.   Chief Judge Armijo also sentenced A. Jones to three years of supervised release for each count, with each term running concurrently.   See Sentencing Minute Sheet at 1; FOF ¶ 4, at 4.   On May 19, 2014, Chief Judge Armijo entered judgment.   See Judgment in a Criminal Case at 1, filed May 19, 2014 (Doc. 55). On September 7, 2018, A. Jones was released from prison and began serving his three-year term of supervised release.   See Judgment in a Criminal Case at 3; Jones Sentencing Memo ¶ 1, at 1-2; June 15 Tr. at 14:6-7 (Snyder, Towne); FOF ¶ 5, at 4.   On June 10, 2019, while A. Jones was on supervised release, the USPO petitioned the Court to issue an arrest warrant for A. Jones and to revoke his supervised release.   See Petition at 1-2.   On June 12, 2019, the Court issued an arrest warrant for A. Jones.   See Arrest Warrant at 1, filed June 12, 2019 (Doc. 118).

1.    **The Petition.**

On June 10, 2019, the USPO filed the Petition.   See Petition at 1.   In the Petition, the USPO alleges that A. Jones violated a condition of his supervised release: "You must not commit another federal, state, or local crime."   Petition at 1.   The USPO alleges that A. Jones committed murder

on or around June 7, 2019.  See Petition at 1 (citing N.M. Stat. Ann. § 30-2-1).  The USPO alleges

the following:

> On June 7, 2019, the defendant was arrested by officers with the Albuquerque Police Department and charged with an open count of Murder and Tampering with Evidence as evidenced by the Criminal Complaint in Bernalillo County Metropolitan Court, case # T-4-FR-20193203.
>
> According to the Criminal Complaint, the defendant was with his brother walking off of Central SE and became involved in a verbal altercation with multiple individuals.  They left the area with the individuals following.  Moments later, the victim caught up with the defendant who took out a knife and stabbed the victim in the upper right chest.  Moments later, the victim died as a result of the injuries.

Petition at 1.

### 2.    **The USPO Sentencing Memo.**

On May 11, 2020, the USPO filed the Sentencing Memorandum, filed May 11, 2020

(Doc. 133)("USPO Sentencing Memo").  The USPO first summarizes A. Jones' custodial status.

See USPO Sentencing Memo at 1.  The USPO notes that the Court issued an arrest warrant for

A. Jones on June 11, 2019, and that, on June 20, 2019, "an Indictment was filed in Bernalillo

County District Court, case number D202CR201902021, charging the defendant with Voluntary

Manslaughter in violation of New Mexico State Statute, 30-2-3(A)."  USPO Sentencing Memo

at 1.  The USPO says that A. Jones entered into a Plea Agreement in the Second Judicial District

Court, County of Bernalillo, State of New Mexico, on December 27, 2019, and the Second Judicial

District Court "continue[d] sentencing pending the outcome of the Federal supervised release

violation."  USPO Sentencing Memo at 1.  The USPO says that the United States Marshals Service

("U.S. Marshals") arrested A. Jones on December 30, 2019, while he was in state custody, and the

U.S. Marshals detained A. Jones pending a detention hearing.  See USPO Sentencing Memo at 1.

According to the USPO, A. Jones appeared before a United States Magistrate Judge on January 2,

2020, where A. Jones waived the detention hearing.  See USPO Sentencing Memo at 1.  The USPO

says that A. Jones has been detained pending his supervised release revocation hearing.  See USPO

Sentencing Memo at 1.

        The USPO notes that, while the current violation is the first time that A. Jones has violated

his supervised release conditions for this case, A. Jones violated his supervised release conditions

in a previous case in which his supervised release term "was revoked three (3) times as a result of

noncompliance."  USPO Sentencing Memo at 1.  The USPO argues that A. Jones' conduct in this

violation "is very similar to the instant offense of conviction," which involved "the stabbing of

two individuals while the defendant was intoxicated."  USPO Sentencing Memo at 2.  The USPO

notes that A. Jones was indicted initially for voluntary manslaughter, but, after plea negotiations,

A. Jones pled no contest to involuntary manslaughter.  See USPO Sentencing Memo at 2.  The

USPO argues that, under the Guidelines, the conduct for which A. Jones "was initially charged is

a 'crime of violence' as the offense had an element [of] the use of physical force against the person

of another which resulted in the initial Indictment charge of Voluntary Manslaughter which is a

'crime of violence' pursuant to [U.S.S.G. §] 4B1.2 Application Note 1."  USPO Sentencing Memo

at 2 (quoting U.S.S.G. § 7B1.1(a)(1)(i)).  The USPO argues that, although A. Jones pled no contest

to involuntary manslaughter, "the grade of the violation is to be based on the actual conduct of the

defendant rather than the criminal charges [of] which the defendant is convicted."  USPO

Sentencing Memo at 2 (citing U.S.S.G. § 7B1.1 application note 1).  The USPO contends that

A. Jones' violation is a Grade A Violation under the Guidelines.  See USPO Sentencing Memo

at 2.  The USPO says that A. Jones has a criminal history category of III, and, thus, his Grade A

Violation "results in a guideline imprisonment range of 18 to 24 months."  USPO Sentencing

Memo at 2.  The USPO recommends that the Court sentence A. Jones "to 24 months custody with

no term of Supervised Release to follow."  USPO Sentencing Memo at 2.

### 3. **The Jones Sentencing Memo.**

On May 13, 2020, A. Jones filed the Jones Sentencing Memo.  See Jones Sentencing Memo at 1.  A. Jones requests that the Court "impose a time-served sentence and reinstate Mr. Jones on 1-year of supervised release."  Jones Sentencing Memo at 1.  He also admits that he violated a "mandatory condition of his supervised release that he not commit another federal, state, or local crime."  Jones Sentencing Memo at 1.  According to A. Jones, the parties agree that A. Jones' involuntary manslaughter conviction is a Grade B violation under § 7B1.1(a)(2) of the Guidelines, which would subject him "to an advisory revocation range of imprisonment of 8-14 months" and a maximum sentence of two years imprisonment.  Jones Sentencing Memo at 1.

A. Jones first summarizes the relevant facts for sentencing.  See Jones Sentencing Memo ¶¶ 1-25, at 1-25.  He notes that, on September 7, 2018,[3] he began serving a three-year term of supervised release.  See Jones Sentencing Memo ¶ 1, at 1-2.  A. Jones contends that, for the first nine months of his supervised release term, he successfully began to "rebuild[]" his life by attending counseling classes, leasing an apartment, and visiting his family.  Jones Sentencing Memo ¶ 2, at 2.  A. Jones says that, around 8:00 p.m. on June 7, 2019, he and E. Jones walked to a Circle K convenience store to use an ATM before buying dinner at the nearby Sonic, a drive-in, fast-food restaurant located near Central Boulevard and San Pedro Drive SE in Albuquerque.  See Jones Sentencing Memo ¶ 3, at 2.  A. Jones says that the Circle K is located in an "area of Albuquerque [that] is more commonly known as the 'war zone' for its high levels of poverty, drugs

---

[3]A. Jones identifies September 7, 2019, as his supervised release term's start date, see Jones Sentencing Memo ¶ 1, at 1-2, but, based on A. Jones' chronological description of events, and based on the USPO Sentencing Memo, see USPO Sentencing Memo at 1, the Court takes September 7, 2018, to be the correct start date.

and violent crime." Jones Sentencing Memo ¶ 4, at 3. A. Jones recounts that, as he and E. Jones approached the Circle K, they encountered an unknown woman and Chavez. See Jones Sentencing Memo ¶ 5, at 3. A. Jones contends that the unknown woman came near him and E. Jones, and she "began harassing" them by "punch[ing] or shov[ing] him" and "bump[ing] or shov[ing]" E. Jones. Jones Sentencing Memo ¶ 7, at 3. According to A. Jones, the unknown woman and Chavez swung "an unopened umbrella" at him and E. Jones, and Chavez wanted to fight them, but A. Jones says he and E. Jones tried to "walk away from the situation." Jones Sentencing Memo ¶ 10, at 3-4.

A. Jones says he and E. Jones started heading east on Central Boulevard, but the unknown woman and Chavez followed them, so A. Jones and E. Jones "retreated back to the Sonic drive-in lot [by] walking south towards a back alley." Jones Sentencing Memo ¶ 12, at 4. A. Jones says that witnesses told police that a man wearing clothes that matched what E. Jones was wearing produced a knife. See Jones Sentencing Memo ¶¶ 6, 13-15, at 3-6. According to A. Jones, he and E. Jones were soon being "being chased by five people," because an additional two men and one woman began to follow him and E. Jones. Jones Sentencing Memo ¶ 17, at 6. A. Jones says that, while he and E. Jones retreated down an alley, E. Jones handed him his knife. See Jones Sentencing Memo ¶¶ 14, 18, at 4-6. A. Jones contends that Chavez "close[d] in" on him, so A. Jones "turn[ed] and stab[bed]" Chavez "one time in the chest with the knife he took from E. Jones seconds earlier." Jones Sentencing Memo ¶ 18, at 6. A. Jones says that Chavez died at the scene, A. Jones and E. Jones ran down the alley, and police ultimately took A. Jones and E. Jones into custody. See Jones Sentencing Memo ¶¶ 18-20, at 6-7. According to A. Jones, the entire encounter lasted four minutes. See Jones Sentencing Memo ¶ 17, at 6. A. Jones also notes that Chavez' toxicology report indicates that Chavez "had several substances in his system at the time of death." Jones Sentencing Memo ¶ 21, at 7.

A. Jones emphasizes that, although New Mexico initially charged him with first-degree murder and tampering with evidence, "he testified at the state grand jury hearing, [and] the grand jury reduced the charge to Voluntary Manslaughter . . . and found no probable cause on Tampering with Evidence." Jones Sentencing Memo ¶ 22, at 7 (citing Letter from Raymond Maestas to the Court (dated May 11, 2020), filed May 13, 2020 (Doc. 134-1)("Maestas Letter")). A. Jones further notes that he pled guilty to involuntary manslaughter. See Jones Sentencing Memo ¶ 22, at 7 (citing Maestas Letter at 1)). A. Jones states that he would have faced up to ten years imprisonment if he went to trial and received a guilty verdict, but, by accepting his plea agreement, he faced a maximum eighteen-month sentence to run "concurrent to any sentence given by this Court in revocation proceedings." Jones Sentencing Memo ¶ 23, at 8. A. Jones says that, as of May 14, 2020, he has been in custody for 343 days. See Jones Sentencing Memo ¶ 25, at 8.

A. Jones argues that he acted reasonably, because he responded to being chased by retreating. See Jones Sentencing Memo at 8-9. A. Jones asserts:

> Facts that show Mr. Jones had not sought out this confrontation, that he was always in retreat, that he was not initially armed, that he may have been acting in self-defense and defense of his brother, that he and his brother were out-numbered and being pursued and threatened, and also that it could be argued that he may have reacted imperfectly. Looking at the entire incident though, Aldo Jones was reacting reasonably from the beginning until the moment he thought his life was in danger. He continually walked away, tried to exit the encounter, did not put hands on anyone, and at each turn was blocked and/or pursued by the unknown female who was the initial aggressor and John Paul Chavez.

Jones Sentencing Memo at 8-9. A. Jones contends that he exhibited "passiveness" throughout the encounter, because his "attempts to suppress and end the encounter were repeatedly denied and the situation continually escalated." Jones Sentencing Memo at 9. A. Jones argues that Chavez acted "unpredictabl[y]," and that Chavez "was likely under the influence of methamphetamine and a cocktail of other substances." Jones Sentencing Memo at 9. A. Jones notes that none of his and

E. Jones' pursuers -- who remain unknown -- stayed at the scene or gave police statements.  See Jones Sentencing Memo at 9.  A. Jones argues that his pursuers "instigated the encounter" and "caused the situation that led to the death of their friend," Chavez.  Jones Sentencing Memo at 9. A. Jones reiterates that he has spent nearly a year in custody and that he "was performing extremely well on supervision in the 9-months prior to this incident."   Jones Sentencing Memo at 10. A. Jones requests a one-year term of supervised release, and he says that his family supports him and that his parents want him to live with them at their home in Navajo Nation while he completes supervised release.  See Jones Sentencing Memo at 10 (citing Letter from Bridget Quijada to the Court (dated May 1, 2020), filed May 13, 2020 (Doc. 134-1); Letter from Britt R. Maxwell to the Court (dated April 22, 2020), filed May 13, 2020 (Doc. 134-1); Letter from Delilah Lueras to the Court (dated April 30, 2020), filed May 13, 2020 (Doc. 134-1); Letter from Eddy Jones to the Court (dated April 22, 2020), filed May 13, 2020 (Doc. 134-1); Letter from Lenora Jones to the Court (dated April 21, 2020), filed May 13, 2020 (Doc. 134-1); Letter from Priscilla A Preston to the Court (dated April 24, 2020), filed May 13, 2020 (Doc. 134-1)).

    **4.**        **The USPO Amended Sentencing Memo.**

On May 14, 2020, the USPO filed the Amended Sentencing Memorandum, filed May 14, 2020 (Doc. 135)("Amended Sentencing Memo").  The USPO says that, after discussion with the United States and A. Jones' counsel, it does not oppose classifying A. Jones' violation as a Grade B violation, rather than a Grade A violation, which the USPO originally supported.  See USPO Amended Sentencing Memo at 2.  The USPO contends that a Grade B violation and A. Jones' criminal history category of III result in a Guideline imprisonment range of 8 to 14 months.  See USPO Amended Sentencing Memo at 2.  The USPO argues, however, that, "based on the serious nature of the violation which included the death of an individual at the hands of the defendant, it

is recommended that Mr. Jones be sentenced to the statutory maximum sentence of 24 months custody with a one year term of Supervised Release to follow."   USPO Amended Sentencing Memo at 2.

     **5.**       **The May 14, 2020, Hearing**.

On May 14, 2020, the Court held its first revocation hearing.  See Draft Transcript of Hearing at 1 (held May 14, 2020)("May 14 Tr.").  The Court began by summarizing briefly the facts underlying A. Jones' violation.  See May 14 Tr. at 2:9-3:2 (Court).  The Court noted that New Mexico initially charged A. Jones with first-degree murder and tampering with evidence, but that A. Jones ultimately pled guilty to involuntary manslaughter.  See May 14 Tr. at 3:21-22 (Court).  The Court said that the USPO believes that the facts support voluntary manslaughter and, thus, the Court should classify A. Jones' violation as a Grade A violation for supervised release revocation's purposes.  See May 14 Tr. at 3:22-24 (Court).  The Court further noted that both the United States and A. Jones contend that his violation is a Grade B violation.  See May 14 Tr. at 3:25-4:3 (Court).   The Court then confirmed that A. Jones understands that he could be sentenced for up to two years imprisonment and could receive up to three additional years of supervised release.  See May 14 Tr. at 4:10-17 (Court, A. Jones).  The Court noted that the difference between a Grade A violation and Grade B violation is that the Guidelines recommend a range of 18 to 24 months imprisonment for a Grade A violation and a range of 8 to 14 months imprisonment for a Grade B violation, and A. Jones said that he understands the distinction.  See May 14 Tr. at 4:22-5:4 (Court, A. Jones).  The Court said that the primary issue is whether A. Jones committed a Grade A violation or a Grade B violation.  See May 14 Tr. at 5:5-8 (Court).

The United States said that it had reached an agreement with A. Jones and the USPO to classify A. Jones' violation as a Grade B violation.  See May 14 Tr. at 6:12-16 (Nayback).  The

United States said that it reviewed the underlying discovery from the state court proceedings with Lucero, a detective for the Albuquerque Police Department.  See May 14 Tr. at 5:16-19 (Nayback). The United States noted that "state court and federal court are real different," and that it is not sure why New Mexico decided to allow A. Jones to plead guilty to involuntary manslaughter.  May 14 Tr. at 6:5-6 (Nayback).  The United States added that it does not agree with the involuntary manslaughter plea, "given the evidence that [it] saw."  May 14 Tr. at 6:9-10 (Nayback).  The United States argued that it "might just be best for [A. Jones] to plead to the grade B violation," because "it's a shorter hearing and the United States is going to be asking for a" sentence that is "much higher than" what the Guidelines recommend -- "probably the statutory max."  May 14 Tr. at 6:13-16 (Nayback).  The United States also asserted that A. Jones should complete additional temporary supervised release, because he has a criminal history of assaulting people with weapons and is a "danger to the Albuquerque community."  May 14 Tr. at 6:19-20 (Nayback).

The Court noted that the United States must show only by a preponderance of the evidence that A. Jones committed a particular crime, and "it doesn't really matter what the State has done." May 14 Tr. at 7:4-5 (Court).  The Court elaborated that the United States can decide to prove that A. Jones committed voluntary manslaughter -- which is a Grade A violation -- rather than involuntary manslaughter, to which A. Jones pled, which is "something [the Court has] done in the past."  May 14 Tr. at 7:7-10 (Court).  The Court said that, because the USPO is convinced that there is sufficient evidence in the record to find voluntary manslaughter and a Grade A violation, it is "a little difficult for [the Court] to just say, well, that's not true."  May 14 Tr. at 7:18-20 (Court).  The United States acknowledged that it and the USPO "have come to an agreement about a grade B violation at this point."  May 14 Tr. at 7:24-25 (Nayback).  The Court asked the United States to identify the "critical element difference" between voluntary manslaughter and

involuntary manslaughter in New Mexico.  May 14 Tr. at 8:5-6 (Court).  The United States said

that it is not sure of the difference, but it noted some examples of involuntary manslaughter are

"driving [under the influence] resulting in death" and "[n]egligent use of a firearm resulting in

death."  May 14 Tr. at 9:14-16 (Nayback).  The United States said that it believes that "[a]bsence

of heat of passion" is the critical element that distinguishes involuntary manslaughter from

voluntary manslaughter.  May 14 Tr. at 8:22 (Nayback).

 The United States noted that A. Jones and E. Jones were outnumbered, but A. Jones was

the only person who had a weapon, which he used to stab the victim.  See May 14 Tr. at 9:10-17

(Nayback).  The United States said that A. Jones "stabbed and killed the guy within a matter of 10

seconds," even though A. Jones "had plenty of opportunities to leave the scene to get out of this."

May 14 Tr. at 9:17-24 (Nayback).  The United States acknowledged, however, that the case would

be difficult to prove to the Court and that, if A. Jones "were to testify and say he was in fear for

his life and looking at the videos certainly could make that claim, and that's why he stabbed the

guy, then we have a self-defense claim."  May 14 Tr. at 10:4-7 (Nayback).  The United States said

that it was not convinced that it could prove voluntary manslaughter, "even with the preponderance

standard."   May 14 Tr. at 10:11 (Nayback).   The United States hypothesized that the State

prosecutors likely were "worried" that they would be unable to prove voluntary manslaughter and

that A. Jones would raise a self-defense claim.  May 14 Tr. at 10:15 (Nayback).  The United States

reiterated, however, that A. Jones and E. Jones "could have gotten out [of] there" by going inside

the nearby Sonic and calling the police.  May 14 Tr. at 11:7-8 (Nayback).

 The United States confirmed that it does not oppose "modifying the petition to [allow

A. Jones to] plead to a grade B violation."  May 14 Tr. at 11:16-17 (Court).  See id. at 11:18-19

(Nayback).  The United States noted that, for Grade A Violations and Grade B Violations, the

statutory maximum term of imprisonment "remains the same," although the temporary supervised release terms might be "a little bit different."  May 14 Tr. at 11:20-21 (Nayback).  The United States said that it is asking for the statutory maximum term of imprisonment, and it argued that A. "Jones needs more supervision" and "guidance from" his probation officer.  May 14 Tr. at 11:25-12:4 (Nayback).

The USPO summarized its review of the evidence: (i) "there is an altercation [in] the streets but we can't tell who started the altercation"; (ii) A. Jones had something in his hand that is curved while yelling; and (iii) A. Jones stabs the knife into the victim's chest "and the victim was deceased a few moments later."  May 14 Tr. at 13:1-17 (Towne).  The USPO says that it agrees with the United States that A. Jones had opportunities to escape the situation, which did not have "to go that far."  May 14 Tr. at 13:20 (Towne).  See id. at 14:5-20 (Towne).  The USPO acknowledged that A. Jones may have a self-defense claim and that he was outnumbered, but the USPO reiterated that "there were other opportunities to get out of the situation and they were not taken and the fact that it appeared [that] the knife was already out well before stabbing" indicates that there was "some premeditation [and] some willingness to help himself in any way possible."  May 14 Tr. at 14:24-15:4 (Towne).  The USPO thus contended that it believes A. Jones' actions amount to voluntary manslaughter "more than" involuntary manslaughter.  May 14 Tr. at 15:9-10 (Towne).

Before allowing A. Jones to speak, the Court said:

> I'm probably going to have to resolve this dispute.  So I guess I would be inclined to hear from the officer, I'll make factual findings, and decide what it is and then when I decide what the crime is, then . . . we can come back together.  If Mr. Jones want[s] to plea to whatever I have found he can.  And if he doesn't want to agree to it, fine, and then I can just make my findings as to whether he did it or not.  But it seems like we have a disagreement and so I think I probably need to resolve the facts before he can intelligently decide whether to plea.

May 14 Tr. at 15:15-25 (Court).  A. Jones then said that he came to the hearing "with the

understanding that the parties had an agreement, that Mr. Jones was going to admit to a B violation" -- "not that we were going to have an evidentiary hearing." May 14 Tr. at 16:3-6 (Snyder). A. Jones emphasized that he has pled involuntary manslaughter and that the state court accepted his plea. See May 14 Tr. at 16:10-13 (Snyder). The Court interjected to say that the Guidelines do not bind it and that it can "find that [A. Jones] committed another crime." May 14 Tr. at 16:16 (Court). The Court added that the state court "could just dismiss the charges . . . , and the Court could still find that he committed a crime." May 14 Tr. at 16:16-18 (Court). A. Jones said that he understands the Court's point and that he is not prepared to hold an evidentiary hearing that day. See May 14 Tr. at 16:19-21 (Snyder).

A. Jones said that the "whole situation lasted four minutes" and that "there's no witnesses that show anything besides the unknown female being the initial aggressor." May 14 Tr. at 17:5-14 (Snyder). A. Jones argued that, until he stabbed the victim, he was "trying to leave the situation." May 14 Tr. at 17:17 (Snyder). A. Jones noted that, after the unknown woman pushed him, he backed up and did not hit her. See May 14 Tr. at 17:23-25 (Snyder). A. Jones said that he tried to retreat from the situation three times, but that Chavez stopped him each time. See May 14 Tr. at 17:25-18:12 (Snyder). A. Jones said that he tried to leave when the woman started waving an umbrella at him, but she and Chavez followed him, which is when A. Jones took the knife that E. Jones was holding out of E. Jones' hand. See May 14 Tr. at 18:13-23 (Snyder). A. Jones notes that E. Jones -- not him -- is the one who had the knife and initially took it out. See May 14 tr. at 18:24-25 (Snyder). See id. at 19:2-4 ("Eddie told the prosecutor and defense counsel that he took out the knife to show and not use to get[]away from them."). A. Jones also said that witnesses "said that they saw a man with a green shirt with the knife. That was Eddie Jones." May 14 Tr. at 18:25-19:2 (Snyder). A. Jones said that he -- with the knife in hand -- and E. Jones

then ran into the back alley near the Sonic, and the unknown woman, Chavez, and several other people followed them.  See May 14 Tr. at 19:5-7 (Snyder).  According to A. Jones, the group of people began to "cut [him and E. Jones] off and surround [them]."  May 14 Tr. at 19:21-22 (Snyder).  A. Jones said that, first, "out of the corner of his eye he sees somebody coming at him with a big black stick which turned out to be a long umbrella," while onlookers shouted, "shoot them, get them, get them."  May 14 Tr. at 20:6-9 (Snyder).  Then, A. Jones said, Chavez came "out of the corner of his eyes" and he "stab[bed Chavez] and [A. Jones and E. Jones kept] on running." May 14 Tr. at 20:9-11 (Snyder).

A. Jones noted that the other people involved in the altercation have not provided witness statements, and law enforcement has not identified them.  See May 14 Tr. at 20:14-17 (Snyder). A. Jones argued that, if the other people who chased him "felt like they did nothing wrong or [that] . . . they were victims in the matter, certainly they would have called and stuck around, but they didn't do that."  May 14 Tr. at 20:19-22 (Snyder).  A. Jones asserted that he did not provoke Chavez or the other people chasing him and that he acted out of fear and self-defense when he stabbed Chavez.  See May 14 Tr. at 20:23-21:5 (Snyder).  A. Jones said that he pled to involuntary manslaughter, because, if he went to trial for voluntary manslaughter and was convicted, he would have been sentenced for up to ten years imprisonment.  See May 14 Tr. at 21:6-19 (Snyder). A. Jones also said that pleading to involuntary manslaughter "lessen[ed] the risk of possibly a four-year mandatory enhancement if he were to get involuntary manslaughter at trial."  May 14 Tr. at 23:12-14 (Snyder).  A. Jones argued that he had no intent to kill Chavez, who, according to toxicology reports, "had a cocktail of drugs, Fentanyl, meth, opiates, marijuana" in his body when he died.  May 14 Tr. at 22:13-14 (Snyder).  A. Jones added that the other people following him were "possibly under the influence as well," and they would not stop following him after his

repeated efforts to de-escalate and walk away failed.  May 14 Tr. at 23:24 (Snyder).  A. Jones concluded by arguing that the Court should find that he committed a Grade B violation and not hold an evidentiary hearing.  See May 14 Tr. at 23:15-18 (Snyder).

The Court said that it will have to resolve this dispute among the United States, A. Jones, and the USPO.  See May 14 Tr. at 23:19-21 (Court).  The Court said that it must "put [] aside" A. Jones' plea and the mechanics of "how the state court system works."  May 14 Tr. at 23:22-24 (Court).  The Court stated that it will hold "an evidentiary hearing and make factual findings and say what I find."  May 14 Tr. at 24:2-3 (Court).  The Court said that the United States, A. Jones, and the USPO can present whatever evidence or witnesses they have.  See May 14 Tr. at 24:4-8 (Court).  Before concluding, A. Jones noted that he has been in custody for 345 days and that, if the USPO tries to prove that he committed voluntary manslaughter, then it still must overcome his self-defense argument, see May 14 Tr. at 25:18 (Snyder); id. at 26:4-7 (Snyder), and the Court said that "may be a factor," May 14 tr. at 26:8 (Court).

### 6.   The June 15, 2020, Hearing.

On June 15, 2020, the Court held an evidentiary hearing on revocation.  See June 15 Tr. at 1.  The Court said that it must decide whether A. Jones committed a Grade A violation or a Grade B violation under the Guidelines, and that the United States bears the burden of proof.  See June 15 Tr. at 2:14-3:2 (Court); id. at 3:10-11 (Court).  The United States first called to the witness stand Towne, who has been a United States Probation Officer in Albuquerque for almost twenty years.  See June 15 Tr. at 4:17-18 (Nayback); id. at 5:5-11 (Nayback, Towne).  Towne said that he supervises A. Jones.  See June 15 Tr. at 5:18-20 (Nayback, Towne).  Towne testified to A. Jones' criminal history, see June 15 Tr. at 6:8-11 (Towne), to which A. Jones objected on relevancy

grounds, see June 15 Tr. at 6:12-14 (Snyder), but the Court allowed the testimony,[4] see June 15

Tr. at 6:25-7:2 (Court).  Towne testified that the "current case that [A. Jones is] on supervision for

at this time was a stabbing with a screwdriver to the first listed victim, then there was a second

victim which was a stabbing with a knife."  June 15 Tr. at 7:13-16 (Towne).  Towne said that

A. Jones' pending violation is "an open count of murder which was reduced to a grand jury

indictment by the district of Bernalillo County to a voluntary manslaughter.  At this particular time

he has pled guilty to involuntary manslaughter based on an incident that occurred on June 7 of

2019."  June 15 Tr. at 7:24-8:4 (Towne).  Towne said that A. Jones' state court sentence would

run concurrently with any sentence that he receives in federal court.  See June 15 Tr. at 8:25-9:2

(Towne).  Towne testified that he had completed the Albuquerque Police Department's "crisis

intervention training," which covers "de-escalation techniques."  June 15 Tr. at 9:23-25 (Towne).

According to Towne, he learned in the training "how to distance yourself from anything getting

hostile and trying to have a safe egress."  June 15 Tr. at 10:1-3 (Towne).

    The United States turned to the video footage of A. Jones' offense, and it asked Towne

what he saw A. Jones do in the video that caused Chavez' death, see June 15 Tr. at 10:4-6

(Nayback), and A. Jones objected to the question, see June 15 Tr. at 10:7-12 (Snyder).  The Court

responded: "I may not be able to use it but I'll hear it, and it may not be something I can use, but

I'll hear it and I'll take it subject to your objection."  June 15 Tr. at 10:13-16 (Court).  Towne said

that, in the video, Chavez, two women, and two other men followed A. Jones and E. Jones around

the backside of Sonic, at which point A. Jones "swung around and right in front of dumpsters . . .

---

[4]If the Court finds that the preponderance of the evidence supports that A. Jones' conduct amounts to a violation of a state crime, then A. Jones' criminal history will be relevant to calculating the appropriate sentencing range under the Guidelines.

made an aggressive move [toward the] victim" by "pinching him in the chest [and it] appeared he had a knife." June 15 Tr. at 12:1-4 (Towne).  Towne said that pictures and other video footage show that A. Jones had a knife in his hand, and Chavez had an umbrella.  See June 15 Tr. at 12:5-16 (Nayback, Towne).  Towne said that, after A. Jones stabbed Chavez, Chavez fell back on the nearby dumpsters and then fell to the ground within ten to fifteen seconds.  See June 15 Tr. at 13:3-8 (Towne).  Towne testified that, by the time Chavez approached the dumpsters and A. Jones turned around, Chavez stopped advancing on A. Jones, who "lunged forward" and "punched [Chavez] in the chest."  June 15 Tr. at 13:11-16 (Towne).

On cross-examination, Towne said that he had been supervising A. Jones for ten months, beginning with A. Jones' release from prison in September, 2018.  See June 15 Tr. at 14:6-7 (Snyder, Towne).  Towne said that A. Jones first lived at Diersen Charities, a residential re-entry center in Albuquerque, and then A. Jones lived with his sister until he was able to provide for his own living accommodations.  See June 15 Tr. at 14:10-12 (Towne).  Towne testified that: (i) A. Jones received counseling at Diersen Charities; (ii) A. Jones stayed "in compliance with counseling"; (iii) A. Jones never tested positive for drugs or alcohol; and (iv) A. Jones "was able to find a pretty good job." June 15 Tr. at 14:13-25 (Snyder, Towne).  Towne said that there was no reason to believe that A. Jones would not transition successfully into the community.  See June 15 Tr. at 15:9-17 (Snyder, Towne).  Towne said that he had not yet reviewed the two witness statements that A. Jones had submitted that morning or Lucero's police report, which Lucero submitted after investigating the incident.  See June 15 Tr. at 17:6-18:8 (Snyder, Towne).

Towne agreed that "people can be seriously harmed with getting hit by other people's fists and hands."  June 15 Tr. at 19:3-5 (Snyder).  See id. at 19:6 (Towne).  Towne said that he did not know that one of A. Jones' witnesses, Brittany Bridges, testified that people shouted during the

incident: "Fuck him, get him, fuck him, get him."  June 15 Tr. at 19:22 (Snyder).  See id. at 19:24

(Towne).  Towne testified that A. Jones took the knife -- that he used to stab Chavez -- from

E. Jones, which indicates that A. Jones did not come to Sonic with a knife.  See June 15 Tr.

at 20:11-21 (Towne).  Towne said that he is aware that the burden is on the United States to prove

by a preponderance of the evidence that A. Jones violated a supervised release condition.  See

June 15 Tr. at 20:25-22:8 (Snyder, Towne).  A. Jones noted that Towne had testified that A. Jones

had a "point of egress" and "could have not engaged in confrontation," and A. Jones asked Towne

whether he knows that "New Mexico is a stand your ground state."  June 15 Tr. at 22:14-19

(Snyder, Towne).  Towne acknowledged that A. "Jones did not have a duty to retreat."  June 15

Tr. at 22:21-23 (Snyder, Towne).

The United Stated next called Lucero to the stand.  See June 15 Tr. at 23:10-11 (Nayback).

Lucero said he has been working for APD since 2003.  See June 15 Tr. at 24:2 (Lucero).  Asked

about his job history at APD, Lucero said: "I was with the community resource team from 2005 to

2007[,] with the northeast impact team from 2015 to 2018, and I've been with the homicide unit

for about two years."  June 15 Tr. at 24:7-10 (Lucero).  Lucero testified that he has investigated

"approximately 16" homicide cases in the past two years and "hundreds" of assaults.  June 15 Tr.

at 24:15-17 (Lucero).  Lucero then described his investigation:

> On June 7, 2019 I was called at around 21:15 hours, 9:15 p.m. . . . to the Sonic at
> 6320 Central Avenue, Southeast, in reference to a stabbing call.  Uniformed
> officers were dispatched there initially about an hour prior to that in reference to the same
> call.  When I arrived on scene, I was told there were approximately three witnesses
> that were somewhat involved in rendering aid to the victim.  One of them was
> identified as Brittany Bridges.  The other two gentlemen were identified as Gabriel
> Mauldin and Llan Tena.  Those two gentlemen were traveling together in the same
> car.  Those folks remained on scene and waited to be interviewed by detectives.
> When I arrived on scene obviously the victim . . . was still there.  He had been
> pronounced deceased.  At the time we didn't know exactly what had happened to
> him.  But based on the call and what witnesses were saying or telling uniformed

officers prior to my arrival the victim had been stabbed.

June 15 Tr. at 25:8-26:6 (Lucero).  Lucero said that, according to Chavez' autopsy and pathology

report, Chavez suffered "an injury to the upper right portion of his lung, and straight through the

aorta."  June 15 Tr. at 26:19-20 (Lucero).  Lucero said that he interviewed three witnesses at the

scene, and the United States asked him whether video footage or eyewitness accounts are the "best

evidence" based on his training.  June 15 Tr. at 27:21 (Nayback).  A. Jones objected and argued

that Lucero "isn't allowed to give an opinion on what's the best evidence," June 15 Tr. at 27:25-

28:1 (Snyder), but the Court overruled the objection, because it was interested in hearing Lucero's

investigation process as an experienced investigator, see June 15 Tr. at 28:4-10 (Court).  Lucero

said that the video footage is the best evidence in this case, because the three witnesses "never

identified [A. Jones] as being the person who stabbed the victim."  June 15 Tr. at 28:17-18

(Lucero).  Lucero said that the three witnesses "did a field identification," and, while one witness

said that A. Jones "was involved" in the altercation, "all three" witnesses "couldn't identify

[A. Jones] as being the person who stabbed the victim."  June 15 Tr. at 30:3-8 (Lucero).  Lucero

testified that the three witnesses were "parked on the west side of the Sonic, and actually didn't

observe fully what was going on until they made it to the east side of the Sonic parking lot as they

made their exit on to Central Avenue eastbound."  June 15 Tr. at 29:3-7 (Lucero).  Lucero said

that another APD officer took A. Jones and E. Jones into custody "based on the description that"

the witnesses gave Lucero.  June 15 Tr. at 29:19-20 (Lucero).

    Lucero testified that, based on the video footage, Chavez "was running in the same

direction as Mr. Jones and his brother," and Chavez was carrying an umbrella in his hand.  June

15 Tr. at 31:8-9 (Lucero).  See id. at 31:14-15 (Lucero).  Lucero said that he interviewed A. Jones

and tried to interview E. Jones, but E. Jones "invoked his right not to speak."  June 15 Tr. at 31:22

(Lucero).  Lucero testified that A. Jones agreed to give a brief statement, and Lucero recounted the following:

> Basically I asked him to run me through the events of what had transpired that evening.  He stated he and his brother were trying to go I believe was trying to get something to drink from the Circle K which is just west of the [Sonic] in this case.  I believe he told me that at the remembered someone being involved in an altercation at that point.  He didn't indicate whether it was him or his brother.  And that the people that were involved in that altercation would not let him and his brother mass to go through to the [C]ircle K.  At that point had indicated to me that these people tried to jump him which in my opinion meant that they were trying to batter him and his brother, and at that point they retreated to the east side of the Sonic.

June 15 Tr. at 32:4-18 (Lucero).  Lucero testified that A. Jones "had not been involved in any physical altercations."  June 15 Tr. at 32:25-33:1 (Lucero).  Lucero said that he then "informed Mr. Jones that somebody had been stabbed and that the person had succumbed to [] injuries and then it was shortly after that that [A. Jones] declined to speak to me further."  June 15 Tr. at 33:1-5 (Lucero).  Lucero confirmed that A. Jones "completely denied being involved in any assault." June 15 Tr. at 33:13-15 (Nayback, Lucero).

On cross-examination, Lucero said that he has testified at A. Jones' grand jury hearing and detention hearing, and that he "gave a pretrial statement with the prosecutor and defense attorney present."  June 15 Tr. at 34:2-11 (Snyder, Lucero).  Lucero said that, although A. Jones denied being involved in any physical altercation, A. Jones told him that he acted in self-defense when Chavez and others chased him.  See June 15 Tr. at 34:25-35:10 (Snyder, Lucero).  Lucero said that he did not retrieve the umbrella that Chavez and the unknown woman carried, so he did not know if it is "sturdy" or "flimsy."  June 15 Tr. at 35:16-23 (Snyder, Lucero).  Lucero said that he is not aware that one can buy "security umbrellas" online.  June 15 Tr. at 35:24-36: (Snyder, Lucero). Lucero testified that the umbrella was approximately twenty to twenty-four inches long.  See

June 15 Tr. at 36:4-5 (Snyder, Lucero).  A. Jones played video footage of the altercation that a witness recorded on his cellular telephone, and Lucero then said that the umbrella "might be a little longer than 24 inches."  June 15 Tr. at 37:11-12 (Lucero).  A. Jones then requested that the Court incorporate a stipulated exhibit containing Lucero's statements from his grand jury testimony and pretrial interview, and the United States did not object.  See June 15 Tr. at 37:14-38:11 (Snyder, Court, Nayback).  Lucero testified that A. Jones told him that someone said "shoot him" during the altercation and that one of the unknown persons who followed him had a knife.  June 15 Tr. at 38:15-39:3 (Snyder, Lucero).  Lucero said that he is not aware of any facts which would indicate that A. Jones planned the physical altercation, and that Chavez and the unknown woman were the initial aggressors.  See June 15 Tr. at 39:7-40:1 (Snyder, Lucero).  Lucero said that A. Jones and E. Jones were outnumbered during much of the altercation.  See June 15 Tr. at 41:21-22 (Snyder, Lucero).

Lucero testified that there is no duty to retreat in New Mexico, but he added that New Mexico is "not a stand your ground state."  June 15 Tr. at 42:10-11 (Lucero).  Lucero said that there is no forensics evidence, such as DNA or fingerprints, or any other evidence that contradicts A. Jones' assertion that his actions were in self-defense.  See June 15 Tr. at 42:19-43:8 (Snyder, Lucero).  Lucero said that there are several instances in the video footage in which A. Jones tries to distance himself from Chavez and the unknown woman, but Chavez and the woman blocked A. Jones and E. Jones from moving several times.  See June 15 Tr. at 44:13-46:22 (Snyder, Lucero).  Lucero testified that he tried to identify the unknown individuals who participated in the altercation by driving around the scene of the incident one or two weeks after it occurred, but he could not locate them.  See June 15 Tr. at 48:3-7 (Snyder, Lucero).  Lucero testified that, aside from the umbrella, law enforcement and the prosecution do not know what weapons the four

unidentified individuals allegedly possessed during the altercation.  See June 15 Tr. at 48:8-12 (Snyder, Lucero).  Lucero said that the only weapon that law enforcement obtained from the scene is the knife that A. Jones used to stab Chavez.  See June 15 Tr. at 50:13-20 (Snyder, Lucero). Lucero testified that the witnesses' statements indicated that E. Jones initially had the knife and transferred it to Lucero.  See June 15 Tr. at 51:15-53:3 (Snyder, Lucero).  Lucero said that he was not aware that E. Jones sat for an interview in the state court case and told the prosecutor that A. Jones took the knife from him.  See June 15 Tr. at 53:4-10 (Snyder, Lucero).  Lucero testified that, when he interviewed Bridges, one of the witnesses, she said that Chavez ran after A. Jones. See June 15 Tr. at 53:23-55:13 (Snyder, Lucero).  Lucero next testified that Chavez' toxicology report disclosed that Chavez' blood contained traces of the following substances: methamphetamine, amphetamine, ephedrine, methadone, morphine, hydrocodone, THC, and fentanyl, all of which are illegal without a prescription.  See June 15 Tr. at 56:6-57:1 (Snyder, Lucero).  Lucero said that it is sometimes more difficult to de-escalate a conflict involving a person who is under the influence of drugs or alcohol.  See June 15 Tr. at 57:8-11 (Snyder, Lucero).

A. Jones then moved for a directed verdict, arguing that the United States has not met its burden of proving by a preponderance of the evidence that he committed voluntary manslaughter -- or even involuntary manslaughter -- and that the United States has not disproven that he acted in self-defense.  See June 15 Tr. at 58:9-21 (Snyder).  The United States responded by saying that the video footage is the best evidence, and it argued that the footage shows that A. Jones was "in a tense situation" when he stabbed Chavez, killing him "almost immediately."  June 15 Tr. at 59:3-5 (Nayback).  The United States asserted that voluntary manslaughter is manslaughter committed "in a heat of passion and this is a classic voluntary manslaughter case."  June 15 Tr. at 59:7-8 (Nayback).  The United States contended that "there is no evidence before the Court other than

Mr. Jones['] self-serving statements that he was acting in self-defense." June 15 Tr. at 59:9-11 (Nayback). The United States argued that A. Jones' statement "that he wasn't involved in an assault and if he was it was in self-defense sounds like a pretty premeditated statement coming from someone who has got experience in felony stabbings." June 15 Tr. at 59:18-22 (Nayback). The United States said that it "has proved its burden by a preponderance of the evidence through the testimony of Officer Towne and through the testimony of detective [Lucero]" and asked "that the Court deny the motion for a directed verdict." June 15 Tr. at 59:23-60:2 (Nayback). A. Jones countered that voluntary manslaughter is "an intentional killing" that "requires sufficient provocation," and he contended that he committed "justifiable homicide and self-defense" and that the United States has the burden to prove that he did not act in self-defense. June 15 Tr. at 60:7-17 (Snyder). A. Jones reiterated that the evidence shows that: (i) he was not the initial aggressor; (ii) he made four or five attempts to exit the situation; (iii) witnesses heard threats that were directed toward him; (iv) he and E. Jones were outnumbered; and (v) one of the men following him had a black cane. See June 15 Tr. at 60:17-62:6 (Snyder). A. Jones argued that "there is enough evidence to show the Court that the prosecution has not, by a preponderance of the evidence, proved that [A. Jones] wasn't acting in self-defense." June 15 Tr. at 62:9-12 (Snyder). The Court said that A. Jones "may be right" and that it would not grant or deny his motion, but rather take it under advisement. June 15 Tr. at 63:13 (Court).

A. Jones' counsel then called A. Jones to the witness stand. See June 15 Tr. at 62:19-20 (Snyder). A. Jones testified that, on June 7, 2019, he woke at 5:00 a.m. to go to work, and he got off from work at 3:00 p.m., and he bought three sixteen-ounce cans of Budweiser beer on his way home with a co-worker. See June 15 Tr. at 63:13-65:6 (Snyder, A. Jones). A. Jones said that, when he got home, a friend invited him to go to a casino, which A. Jones decided he would do

later that evening, because he first needed to wait for E. Jones to come "back from work."  June 15

Tr. at 65:14-15 (A. Jones).  A. Jones testified that E. Jones came to his home around 3:30 p.m.,

relaxed, and drank some of the beer which A. Jones had bought.  See June 15 Tr. at 65:15-66:10

(Snyder, A. Jones).  A. Jones said that, around 7:50 p.m., he and E. Jones decided to get dinner,

but A. Jones said that he owed E. Jones money, so they first went to Circle K to use an ATM to

get cash.  See June 15 Tr. at 66:13-67:12 (Snyder, A. Jones).  A. Jones testified that, after they got

cash, he and E. Jones decided to go to Sonic for dinner, so they crossed the street, and after walking

forty yards, they encountered two men and two or three women in a heated confrontation.  See

June 15 Tr. at 67:14-68:5 (Snyder, A. Jones).  A. Jones said that, when they got near the group of

people who were arguing, he was "nice and polite," and said: "[E]xcuse me."  June 15 Tr. at 67:11-

14 (A. Jones).  A. Jones testified that, after he passed the group, one woman started "calling [him]

names," which he ignored, but when he turned around, he saw the woman "pointing her fingers to

[E. Jones'] face."   June 15  Tr. at 68:30-69:6 (A. Jones).   A. Jones said that E. Jones tried to

apologize, and that A. Jones grabbed E. Jones and told him to keep going.   See June 15  Tr.

at 69:15-70:13 (A. Jones, Snyder).  A. Jones said that the woman swung at him and he ducked.

See June 15 Tr. at 70:14-16 (A. Jones).  A. Jones said that he told the group that he was trying to

leave, and that he and E. Jones did not want any problems, but the group started surrounding him

and calling him names.  See June 15 Tr. at 70:19-71:19 (A. Jones).

A. Jones testified that Chavez "tried to come at us," at which point A. Jones pushed

E. Jones behind him and again told Chavez that they did not want any problems, but Chavez

became "more aggressive," and A. Jones said he offered to buy the group of people drinks.  June 15

Tr. at 72:4-5 (A. Jones).  A. Jones said that he "was wondering what's wrong with you guys"

throughout the entire encounter.  June 15 Tr. at 72:9-10 (A. Jones).  A. Jones testified that Chavez

was "trying to hit [him] with an umbrella" and that A. Jones "kept jumping back and [he] told [Chavez] relax, chill, kick back."  June 15 Tr. at 72:12-14 (A. Jones).  A. Jones said that he tried running across Central Boulevard to escape and that his retreat was in the camera's "blind spot." June 15 Tr. at 74:2 (A. Jones).  See id. at 72:18-20 (A. Jones); id. at 73:21-74:10 (A. Jones, Snyder).  According to A. Jones, there was too much traffic to cross Central Boulevard, and, of the four people following him at the time, one man had a cane that he swung at A. Jones, and a small woman tried to stab him with a knife, which she held in her hand.  See June 15 Tr. at 74:5-10 (A. Jones); id. at 75:12-17 (A. Jones).  A. Jones said that E. Jones also had a knife, which he took away from E. Jones "to let [the other people] know that we're not trying to pose a threat or anything like that" and "to diffuse [the] situation."  June 15 Tr. at 76:11-16 (A. Jones).  A. Jones said that he and E. Jones continued to walk away, but the other people kept charging after them. See June 15 Tr. at 77:3-6 (A. Jones).  A. Jones said that he next ran to the back of Sonic, and, while he retreated, he could hear someone yelling: "[S]hoot him, just shoot him, shoot him."  June 15 Tr. at 77:13-14 (A. Jones).  A. Jones said that he realized that his "life was really" in danger, because he was in a part of Albuquerque known as the "war zone," "because there are gangs, high violence, [and] drugs."  June 15 Tr. at 78:11-17 (A. Jones).  A. Jones testified that Chavez chased him and blocked him from running away, and that Chavez "was ready to whack [him] with" an object that Chavez was holding "in the air."  June 15 Tr. at 79:11-12 (A. Jones).

A. Jones testified that he stabbed Chavez, but A. Jones said: "Everything happened fast," so "it didn't feel like I stabbed the guy . . . .  I felt like I punched him or pushed him [and] it didn't really feel like [I stabbed him] because . . . it happened really fast."  June 15 Tr. at 79:24-80:4 (A. Jones).  A. Jones said that one of the men who followed him reached for something near his belt, and A. Jones was afraid that the man had a gun.  See June 15 Tr. at 80:5-81:1 (A. Jones,

Snyder).  A. Jones said that he and E. Jones began running as fast as they could, because they did not "want to get gunned down."  June 15 Tr. at 81:8 (A. Jones).  Shortly after running off, A. Jones said that a police officer pulled up to him and E. Jones and "shined his lights."  June 15 Tr. at 81:19-20 (A. Jones).  A. Jones testified that the police officer told them to stop, get on the ground, and put their hands in the air, and A. Jones said that, as the police officer exited the vehicle, A. Jones "pushed the knife aside," because he did not "want to get caught holding the knife."  June 15 Tr. at 81:25-82:1 (A. Jones).  A. Jones said that the police officer held him and E. Jones in the back of the police vehicle for hours, and that police interrogated him at around 3:20 a.m.  See June 15 Tr. at 82:23-83:11 (Snyder, A. Jones).

A. Jones confirmed that he was held in custody from June 7, 2019, to December 27, 2019, and that he pled no contest to involuntary manslaughter.  See June 15 Tr. at 83:12-16 (Snyder, A. Jones).  A. Jones said that he was initially charged with murder, but he testified before the grand jury and his charges were reduced to voluntary manslaughter, and then he accepted a plea to involuntary manslaughter.  See June 15 Tr. at 83:17-84:1 (Snyder, A. Jones).  A. Jones said that he accepted the plea, because, although he felt that he had a strong case, he did not want to risk losing a trial and receiving a ten-to-twelve-year sentence.  See June 15 Tr. at 84:4-11 (A. Jones).  A. Jones testified that he pled to two prior felonies in his plea, and that, if he "went to trial and lost on anything [he would receive] four years of habitual time."  June 15 Tr. at 84:15-17 (Snyder).  See id. at 84:18-23 (Snyder, A. Jones).  A. Jones said that, if he pled to involuntary manslaughter, he would receive a maximum sentence of eighteen months, and he had already served seven months.  See June 15 Tr. at 84:24-85:5 (Snyder, A. Jones).  A. Jones testified that he accepted the plea, even though he believes that he acted in self-defense.  See June 15 Tr. at 85:12-16 (Snyder, A. Jones).  A. Jones said that, when he is released from custody, he hopes to live with his family

while completing supervised release.  See June 15 Tr. at 85:24-86:15 (Snyder, A. Jones).

On cross-examination, the United States first asked A. Jones what he told Lucero about his involvement in the incident and, second, whether A. Jones reviewed his statement to Lucero before testifying that day.  See June 15 Tr. at 87:7-11 (Nayback).  A. Jones objected on the basis of improper impeachment, see June 15 Tr. at 87:12-13 (Snyder), but the Court overruled the objection, see June 15 Tr. at 87:15 (Court).  A. Jones said he does not think he reviewed his statement, see June 15 Tr. at 87:14 (A. Jones), and the United States then asked A. Jones whether he denied being involved in stabbing Chavez to Lucero, see June 15 Tr. at 87:21-22 (Nayback).  A. Jones said, "[n]o," but he admitted that he "denied being involved in an altercation."  June 15 Tr. at 87:23-25 (A. Jones).  A. Jones said that he does not remember what he told Lucero about the altercation, but he testified that his counsel provided him a copy of his statement to law enforcement, which he read.  See June 15 Tr. at 88:6-18 (Nayback, A. Jones).  A. Jones also said that he can read, and he reiterated that he does not remember what he told Lucero about the altercation.  See June 15 Tr. at 88:19-23 (Nayback, A. Jones).  The United States told A. Jones that his testimony about a group of people threatening him is different from the statement that he previously gave law enforcement, and the United States asked A. Jones if he "realized over time that it's better for [his] defense claim if [he] told the story that [he] told today."  June 15 Tr. at 90:4-6 (Nayback).  A. Jones objected that the question infringes on his constitutional right to an attorney, see June 15 Tr. at 90:9-12 (Snyder), and the Court responded by saying that it will hear A. Jones' answer and decide whether it can use the evidence without infringing upon his rights, see June 15 Tr. at 90:13-18 (Court).  A. Jones testified that he does not remember stabbing Chavez, see June 15 Tr. at 90:25-91 (A. Jones), and the United States asked whether alcohol consumption is the reason for his memory lapse, see June 15 Tr. at 91:2-11 (Nayback, A. Jones).  A. Jones said

that he was holding the knife like he "was cutting some potatoes" and that he used the knife out of

"fear" and to "get away."  June 15 Tr. at 91:24-92:8 (A. Jones, Nayback).  A. Jones noted that the

video footage lacks sound and that none of the witnesses said that anyone shouted, "shoot him."

June 15 Tr. at 92:8-16 (A. Jones, Nayback).

  The United States asked A. Jones whether Chavez saw him coming when he stabbed

Chavez, see June 15 Tr. at 92:25 (Nayback), and A. Jones objected that he cannot testify to what

Chavez saw, see June 15 Tr. at 93:1-2 (Snyder).  The Court overruled the objection, see June 15

Tr. at 93:3-5 (Court), and the United States next asked A. Jones whether Chavez was looking in

his direction when he stabbed Chavez, see June 15 Tr. at 93:7-9 (Nayback).  A. Jones said that

Chavez knew what he was doing, see June 15 Tr. at 93:10-11 (A. Jones), and the United States

asked for A. Jones' basis for his answer, see June 15 Tr. at 93:12 (Nayback), to which A. Jones

objected as "badgering the witness," June 15 Tr. at 93:13-14 (Snyder).  The Court overruled the

objection.  See June 15 Tr. at 15-19 (Court).  A. Jones testified that Chavez was watching him and

observing each of his actions.  See June 15 Tr. at 93:20-24 (A. Jones).  A. Jones conceded that,

although he testified that Chavez swung an umbrella at him multiple times, the video footage does

not contain recordings of Chavez swinging the umbrella.  See June 15 Tr. at 95:18-96:5 (A. Jones,

Nayback).  A. Jones testified that, other than the umbrella, the only other weapons which he saw

were a cane, which another man carried, and a knife, which a woman carried, but A. Jones admitted

that the video footage does not contain recordings of either weapon.  See June 15 Tr. at 96:16-97:5

(Nayback, A. Jones).  The United States asked A. Jones whether he could have left the scene and

walked inside of the Sonic, but A. Jones said that there was not enough time to go into the Sonic.

See June 15 Tr. at 97:16-98:2 (Nayback, A. Jones).  A. Jones testified that Chavez could have

injured his eye with the umbrella, so A. Jones jumped back every time Chavez swung the umbrella

at him.  See June 15 Tr. at 98:11-25 (Nayback, A. Jones).  A. Jones said that he did not think Chavez was intoxicated by alcohol, but he thought that Chavez might be on drugs.  See June 15 Tr. at 99:8-10 (A. Jones).  A. Jones said that he cannot remember whether he was ever hit with the umbrella or the cane, because his adrenaline levels were high.  See June 15 Tr. at 99:13-100:4 (Nayback, A. Jones).  A. Jones testified that, at the time of the altercation, he was not intoxicated and had not drunk alcohol in the prior four hours.  See June 15 Tr. at 100:5-10 (Nayback, A. Jones). A. Jones reiterated that he stabbed Chavez after Chavez held an unidentifiable object in the air and that he heard someone say: "[S]hoot him."  June 15 Tr. at 100:19-24 (A. Jones).  A. Jones again said that he feared for his life, because he did not know if one of the people following him had a gun, and the United States noted that it is important for A. Jones' self-defense argument to say that he was in fear.  See June 15 Tr. at 101:12-102:1 (A. Jones, Nayback).

A. Jones testified that it is a violation of his supervised release conditions to drink alcohol, and he said that he has violated this condition in the past and admitted his mistake to his probation officer, Towne.  See June 15 Tr. at 102:15-24 (Nayback, A. Jones).  A. Jones said that it is also a violation of his supervised release conditions to stab someone, and the United States asked if that is why he threw the knife aside when a police officer stopped him after the altercation.  See June 15 Tr. at 103:7-12 (Nayback, A. Jones).  A. Jones testified that he did not want to get shot by a police officer.  See June 15 Tr. at 103:14-16 (Nayback, A. Jones).  See id. at 102:14 (A. Jones).

On redirect, A. Jones testified that he told Lucero that the people chasing him had an umbrella, a cane, and knives.  See June 15 Tr. at 105:19-20 (A. Jones).  A. Jones said that the size of the people carrying these weapons did not matter to him.  See June 15 Tr. at 106:17-107:7 (Snyder, A. Jones).  A. Jones testified that, when Chavez approached him and he heard someone yelling "shoot him," he did not contemplate whether his actions violate his supervised release

conditions.  See June 15 Tr. at 107:8-12 (Snyder, A. Jones).  A. Jones then stepped down from the witness stand.  See June 15 Tr. at 107:19-22 (Court).

A. Jones called Dr. DiVasto to the witness stand.  See June 15 Tr. at 107:22-108:2 (Snyder).  A. Jones said that the parties have stipulated that Dr. DiVasto is an "expert of psychology" for "reviewing use of force situations and high stress and rapidly unfolding encounters."  June 15 Tr. at 108:8-10 (Snyder).  Dr. DiVasto said that he received his doctorate in 1977 and became a licensed psychologist in 1989.  See June 15 Tr. at 109:12-14 (DiVasto).  Dr. DiVasto said that, for the past thirty to thirty-five years, he has been "almost exclusively involved in police psychology" in Albuquerque and Las Cruces, New Mexico.  June 15 Tr. at 109:20 (DiVasto).  Dr. DiVasto testified that, "when officers and deputies get involved in officer involved shootings, departments have found it helpful to send them for some sort of psychological debriefing afterwards to help them deal with the [consequences] of a shooting."  June 15 Tr. at 110:14-19 (DiVasto).  Dr. DiVasto said that he has reviewed use-of-force incidents for 350 officers.  See June 15 Tr. at 110:22-111:2 (Snyder, DiVasto).  Dr. DiVasto testified that he has taken courses about use of force and is certified to review use-of-force incidents.  See June 15 Tr. at 111:5-20 (DiVasto, Snyder).  A. Jones asked Dr. DiVasto to describe the conclusions and opinions that he offers as a use-of-force expert.  See June 15 Tr. at 113:5-7 (A. Jones).  Dr. DiVasto responded:

> I feel like my job as the person analyzing these cases is to look at what the circumstances were at that moment that deadly force was used, what led up to it. What limitations if any, the person who has been accused, what limitations they may have had that led them to use deadly force instead of some sorry method of force off de-escalation.  Try to put the jury in the mind of the person at that moment.

June 15 Tr. at 113:8-15 (DiVasto).

Dr. DiVasto testified that, when he reviews a use-of-force encounter, he reviews all

available documentation, such as "witness statements, [the] defendant's statement, autopsy reports, . . . [and] amateur and surveillance videos."   June 15 Tr. at 115:18-22 (DiVasto). Dr. DiVasto said that it is helpful to have this information before speaking to the defendant so that he can establish the defendant's veracity when he speaks to the defendant.   See June 15 Tr. at 116:3-9 (DiVasto).  Dr. DiVasto testified that he has twice declined to assist in a case, because he "thought [his] testimony would not enhance the defendant's chances of being found not guilty." June 15 Tr. at 116:12-14 (DiVasto).   Dr. DiVasto said that he has reviewed the following documents before speaking to A. Jones: the video footage, A. Jones's statement to Lucero, Lucero's statement to the grand jury, the witness statements, Chavez' toxicology report, the initial responders' reports, and Lucero's investigation report.   See June 15 Tr. at 116:23-117:16 (DiVasto, Snyder).  Dr. DiVasto testified that, based on his review of the materials, he had concluded that A. Jones and E. Jones tried to flee the scene, and they "made attempts at de-escalation that did not  happen to work."  June 15 Tr. at 117:18-19 (DiVasto).  Dr. DiVasto said that A. Jones feared that his life was in danger, and, when Chavez approached A. Jones from the side, A. Jones was "afraid [that Chavez] was going to block his flight from that scene."  June 15 Tr. at 118:1-2 (DiVasto).  Dr. DiVasto testified that A. Jones did not know whether he stabbed or punched Chavez, but that A. Jones "knew he had encountered [Chavez] physically" and "was surprised to hear he had stabbed him."  June 118:5-8 (DiVasto).

Dr. DiVasto said that he interviewed A. Jones "in the state public defender's office as part of his trial in state court," June 15 Tr. at 118:13-15 (DiVasto), and that the interview covered A. Jones' criminal history and the events leading up to A. Jones stabbing Chavez, see June 15 Tr. at 118:15-17 (DiVasto). Dr. DiVasto said that A. Jones' criminal history partly impacts his review of the case, because A. Jones' criminal history indicates that A. Jones "had been in some pretty

rough situations and knew that life on the street could be pretty rough."  June 15 Tr. at 118:24-25 (DiVasto).  Dr. DiVasto noted, however, that he "was most interested in that eight or 10 seconds" that A. Jones and E. Jones fled from Central Avenue to the dumpsters behind Sonic.  June 15 Tr. at 119:1-2 (DiVasto).   A. Jones played the incident's video footage and asked Dr. DiVasto to comment on aspects of the video footage that stood out to him, but the United States objected, because the video footage is blurry and lacks sound.  See June 15 Tr. at 119:6-120:19 (Snyder, DiVasto, Nayback).  The Court instructed A. Jones that Dr. DiVasto must provide a basis for his testimony about what A. Jones said during the incident and why he acted the way he did, because the video footage lacks sound and it is unclear how Dr. DiVasto has reached his conclusions.  See June 15 Tr. at 120:20-121:9 (Court, Snyder).

Dr. DiVasto testified that the video footage shows A. Jones walking away from the verbal altercation between the unknown woman and E. Jones, see June 15 Tr. at 122:6-8 (DiVasto), which indicates that A. Jones "was disengaging," June 15 Tr. at 122:11-12 (DiVasto).   Dr. DiVasto testified that A. Jones does not appear to escalate the situation.  See June 15 Tr. at 122:23-24 (DiVasto).  Dr. DiVasto said that the unknown woman does not appear to try to disengage from the situation, because she tried to poke A. Jones and E. Jones with an object, and she blocked their path from leaving.  See June 15 Tr. at 123:6-14 (DiVasto, Snyder).  Dr. DiVasto then testified that Chavez took an object from the unknown woman and chased A. Jones.  See June 15 Tr. at 123:21-23 (DiVasto).  According to Dr. DiVasto, A. Jones did not display aggression toward Chavez and the unknown woman.  See June 15 Tr. at 126:4-6 (Snyder, DiVasto).  Dr. DiVasto testified that A. Jones told him that, during the incident, he was most afraid that Chavez would block him from leaving the scene and that "whoever was behind him was going to shoot him or stab him."  June 15 Tr. at 126:20-21 (DiVasto).  Dr. DiVasto also said that being outnumbered was a contributing

factor to A. Jones responding in the moment by using force when he was blocked from leaving the situation.  See June 15 Tr. at 127:3-10 (Snyder, DiVasto).

Dr. DiVasto also testified that the entire incident lasted about seven seconds, and, during such short encounters, people are "less able . . . to formulate a plan [and] less able . . . to incorporate what's happened and deal with it and come up with alternatives perhaps." June 15 Tr. at 128:4-6 (DiVasto).  Dr. DiVasto testified that, "[b]ased upon the analysis of performance of untrained people in high stress situations," he has "an opinion about Aldo's ability to select from a number of variables at that moment" about how to respond to Chavez chasing him and blocking his movement. June 15 Tr. at 129:13-16 (DiVasto).  Dr. DiVasto said that, when most people are confronted with a high-stress situation with few options for responding, "they focus on the threat. And may not see other choices or other external inputs."  June 15 Tr. at 130:11-12 (DiVasto). Dr. DiVasto testified that, compared to a layperson, "a trained person perceives many more variables in these sort of encounters.  They're very much able to control their reaction to them." June 15 Tr. at 130:22-24 (DiVasto).  Dr. DiVasto explained that some of these "variables" include "things like proximity, threat, ability of the threat to be carried out, intervening variables like would anybody else be harmed if I use deadly force in this situation. . . .  And they have to incorporate all this information instantly when these things happen."   June 15 Tr. at 131:2-9 (DiVasto). Dr. DiVasto testified that Chavez' "menac[ing] [] behavior with what we now know is an umbrella made him a greater threat at that moment, and the fact that there [were] other accomplices [and] that people were saying shoot him, get him, F, F him up" contributed to the high-stress environment. June 15 Tr. at 131:20-23 (DiVasto).  Dr. DiVasto said that the fast-paced encounter, the lack of time to consider alternative actions, and "the threat [posed by Chavez] coming in peripherally from the side made it more difficult [for A. Jones] to assess" the situation.  June 15

Tr. at 132:19-21 (DiVasto).

Dr. DiVasto said that he typically interviews defendants "anywhere from two to four days after the incident when they've had a chance to sleep, sometimes had a chance to look at the videotape, et cetera." June 15 Tr. at 136:10-13 (DiVasto). Dr. DiVasto said that the fact that A. Jones had been awake since 5:00 a.m. the day of the incident might affect "his ability to recall details." June 15 Tr. at 138:1 (DiVasto). Dr. DiVasto testified that, analyzing the situation as a whole, A. Jones "acted reasonably" by using force. June 15 Tr. at 138:5 (DiVasto).

Dr. DiVasto is self-employed, has a private business, and charges $200.00 to review records and $400.00 an hour for testimony and depositions. See June 15 Tr. at 138:12-22 (Nayback, DiVasto). Dr. DiVasto said that evaluating police officers to assess their fitness for duty is a "[v]ery small part of what" he does. June 15 Tr. at 139:14 (DiVasto). The Court then decided to continue the hearing. See June 15 Tr. at 141:24-142:2 (Court).

**7.      The June 26, 2020, Hearing.**

On June 26, 2020, the Court resumed the June 15, 2020, evidentiary hearing. See June 26 Tr. at 1. The United States resumed its cross-examination of Dr. DiVasto. See June 26 Tr. at 3:20-4:3 (Nayback, Court). Dr. DiVasto said that he had served as a use-of-deadly-force expert in state court approximately ten times and that prosecutors never challenged his opinions as scientifically unreliable in his presence. See June 26 Tr. at 4:5-13 (Nayback, DiVasto). Dr. DiVasto said that psychology is an academic discipline concerning "[i]ntangibles such as thought and feelings." June 26 Tr. at 4:22 (DiVasto). Dr. DiVasto testified that "[b]ehavior and interaction are typically measurable," June 26 Tr. at 4:23-24 (DiVasto), and that he had never heard the terms "hard sciences and soft sciences" in his forty years as a psychologist, June 26 Tr. at 1-3 (Nayback, DiVasto). Dr. DiVasto said that, when he participates in criminal cases as an expert, he interviews

- 54 -

the defendant, but he does not subject the defendant to forensic psychological testing.  See June 26 Tr. at 5:17-23 (Nayback, DiVasto).  Dr. DiVasto testified that, whereas this case involves a knife, all of the other criminal cases in which he has served as an expert involved a firearm.  See June 26 Tr. at 5:24-6:4 (Nayback, DiVasto).

Dr. DiVasto said that he interviewed A. Jones for somewhere between ninety minutes and two hours.  See June 26 Tr. at 6:22-25 (Nayback, DiVasto).  Dr. DiVasto testified that, during interviews, he asks defendants about their perceptions and feelings during alleged crimes that they committed and that he typically testifies that each defendant he has interviewed perceived his or her life to be in danger.  See Jun 26 Tr. at 7:5-21 (Nayback, DiVasto).  He said that he also typically tells the jury that a defendant's use of deadly force was justified in light of the circumstances that the defendant faced.  See June 26 Tr. at 8:15-17 (Nayback, DiVasto).  Dr. DiVasto testified that he tries to put jurors "in the mind of the [defendant] at [the] moment" of an offense, June 26 Tr. at 9:4-7 (Nayback, DiVasto), because "[t]he moment that [an offense] happens is quite different from the atmosphere of a courtroom where we have time to think and consider," June 26 Tr. at 9:9-11 (DiVasto).  Dr. DiVasto said that "one of [his] goals is to get the jury to see [a situation] as the defendants saw it a that moment" and to put jurors in the "defendant's shoes."  June 26 Tr. at 9:11-14 (DiVasto).  Dr. DiVasto said that, when he testifies to a jury about defendants' perceptions, "[a]ll we have to rely on is what [defendants] tell us."  June 26 Tr. at 10:1-2 (DiVasto).  Dr. DiVasto said that he also relies on corroborating evidence such as witness statements, video footage, police reports, and physical evidence.  See June 26 Tr. at 10:3-11 (Nayback, DiVasto).  Dr. DiVasto testified that he reviewed Lucero's report, which states that A. Jones denied involvement with the altercation to Lucero.  See June 26 Tr. at 10:12-15 (Nayback, DiVasto).

On redirect, Dr. DiVasto reiterated that he does not make conclusions about defendants

based only on his interviews of defendants; interviews are only one part of his reviews.  See June 26 Tr. at 11:11-16 (Snyder, DiVasto).  Dr. DiVasto said that he would not testify in a case if a defendant tells him information that contradicts physical or other evidence.  See June 26 Tr. at 11:17-22 (Snyder, DiVasto).  Dr. DiVasto said that, although he said during the United States' cross-examination that his defendant interviews are the only thing on which he relies to form his conclusions, he also relies on the evidence that is available to him.  See June 26 Tr. at 11:23-12:2 (Snyder, DiVasto).

The United States argued that "the record before the Court is sufficient by a preponderance of the evidence, that the defendant committed grade A violation."  June 26 Tr. at 12:24-13:2 (Nayback).  The United States asserted that it is "clear by a preponderance of the evidence is that the defendant stabbed and killed Mr. Chavez in a heat of passion," "[w]hich is classic voluntary manslaughter."  June 26 Tr. at 13:8-10 (Nayback).  The United States noted that A. Jones testified that his "adrenaline was going" during the altercation, and "[t]hat is tantamount to heat of passion."  June 26 Tr. at 13:12-13 (Nayback).  The United States asserted that there is "no factual basis for an involuntary manslaughter charge here."  June 26 Tr. at 13:14-15 (Nayback).  The United States opined that "there must have been significant bargaining going on [in state court] to arrive at that charge."  June 26 Tr. at 13:19-21 (Nayback).  The United States argued that the Court should not consider Dr. DiVasto's testimony, because it is "tantamount to" impermissible "vouching."  June 26 Tr. at 14:2-3 (Nayback).  The United States asserted that Dr. DiVasto takes A. Jones at his word, "parrots" A. Jones' "self-serving statement[s]," and gives an unscientific opinion "that the use of deadly force was reasonable under the story that the defendant told him."  June 26 Tr. at 14:6-10 (Nayback).  The United States contended that "all [Dr. DiVasto] really says is law enforcement officers are better in stressful situations than civilians."  June 26 Tr. at 14:11-13

(Nayback).

The United States also argued that the Court should not consider A. Jones' testimony, because "[i]t was significantly different than what he told law enforcement." June 26 Tr. at 14:15-16 (Nayback). The United States averred that A. Jones' testimony was "contrived and self-serving," because "[i]t serves the purpose of trying to create a self-defense claim, or at a minimum grade B violation of involuntary manslaughter." June 26 Tr. at 14:24-15:2 (Nayback). The United States asserted that the video footage and evidence demonstrate by a preponderance of the evidence that A. Jones committed voluntary manslaughter, which is a Grade A Violation under the Guidelines. See June 26 Tr. at 15:2-8 (Nayback).

A. Jones requested that the Court find that he did not violate his supervised release conditions. See June 26 Tr. at 15:17-18 (Snyder). A. Jones noted that the state court's conclusions and his involuntary manslaughter plea do not bind the Court. See June 26 Tr. at 15:19-20 (Snyder). A. Jones noted that "[v]oluntary manslaughter results when a person knows their actions create a strong probability of death or great bodily harm, and it requires proof of criminal intent, general criminal intent to kill." June 26 Tr. at 15:22-16:1 (Snyder). A. Jones contended that "provocation in this case was absent," because the "evidence shows that he continually disengaged." June 26 Tr. at 16:2-6 (Snyder). A. Jones emphasized that there "is no duty to retreat" under New Mexico law, and, if A. Jones had gone to trial, the jury would have received a jury instruction about A. Jones' right to "stand his ground and defend himself." June 26 Tr. at 16:19-23 (Snyder). A. Jones argued that the United States "has not provided any evidence that Mr. Jones was not acting in self-defense." June 26 Tr. at 16:25-17:1 (Snyder). A. Jones argued that "[t]his case is justifiable homicide and self-defense," and "at the very most involuntary manslaughter." June 26 Tr. at 17:5-7 (Snyder). A. Jones noted that, if he had gone to trial and was convicted of involuntary

manslaughter, then "he would have had to face a four year mandatory habitual offender enhancement," but his plea guaranteed a maximum eighteen-month sentence to run concurrently to the Court's sentence in this case.  June 26 Tr. at 17:10-12 (Snyder).

A. Jones emphasized that he did not bring the knife to the fight, because "[t]here is irrefutable evidence that Eddie Jones initially had the knife that was used to stab John Paul Chavez and Aldo took it from him right in front of the Sonic."   June 26 Tr. at 17:21-24 (Snyder). According to A. Jones, he said "in his pretrial interview that he assumed that Eddie had committed the stabbing because he was the person he saw with the knife, describing him as the person with the knife in an olive colored shirt and wearing a hat."  June 26 Tr. at 18:1-5 (Snyder).  A. Jones said that he "clarified in the pretrial statement that the man with the knife was with a man in the blue hoodie," which is him.  June 26 Tr. at 18:6-7 (Snyder).  A. Jones asserted that he took the knife from E. Jones "to disengage and retreat."  June 26 Tr. at 18:12-13 (Snyder).  A. Jones argued that the United States has no evidence that he was an "aggressor" or that he escalated the altercation, and that he "displayed no intent to engage in a confrontation that could lead to violence."  June 26 Tr. at 18:23-19:1 (Snyder).  A. Jones asserted that he continuously attempted to leave, but Chavez and the unknown woman repeatedly blocked him from leaving, and another unknown man carried a stick or cane, and yet another man repeatedly reached into his waistband for something.  See June 26 Tr. at 19:5-12 (Snyder).  A. Jones reiterated that the men and women who threatened, harassed, and followed A. Jones and E. Jones also outnumbered them.  See June 26 Tr. at 19:13-17 (Snyder).  A. Jones noted that Bridges, "an unbiased Sonic customer" who witnessed the altercation, told law enforcement that the unknown woman is the person who escalated the encounter.  June 26 Tr. at 19:18-19 (Snyder).

A. Jones stressed that the unknown assailants carried weapons and other objects, such as a

woman with a small two-inch blade, a woman with a backpack, a man reaching for something in his waistband, a man with a small bat, and a man with cane that he used to swing at A. Jones.  See June 26 Tr. at 20:12-16 (Snyder).  A. Jones notes that some of the unknown individuals yelled, "shoot him," and the "situation escalate[d] quickly due to [the] speed of [the] assault."  June 26 Tr. at 20:17-22 (Snyder).  A. Jones notes that his hoodie "may have blocked some peripheral vision that he had."  June 26 Tr. at 20:25-21:1 (Snyder).  A. Jones reiterated that Chavez' toxicology report revealed a number of drugs in his body at the time of death and that Lucero testified that "it is difficult to de-escalate or reason with people impaired by drugs or alcohol."  June 26 Tr. at 21:10-12 (Snyder).  A. Jones argued that he faced a "legitimate" threat and that "his reaction was reasonable."  June 26 Tr. at 21:15-16 (Snyder).  A. Jones asserted that his "actions were justified" and "in defense [of] himself and his brother of a serious violent felony."  June 26 Tr. at 21:18-20 (Snyder).  A. Jones then concluded by arguing that the "Court should find that no violation occurred and release Mr. Jones, and at the very most [conclude that his conduct is] a [Grade] B violation to involuntary manslaughter."  June 26 Tr. at 22:3-6 (Snyder).  The Court asked A. Jones whether one or two women were involved in the altercation.  See June 26 Tr. at 22:7-10 (Court).  A. Jones said that there were two women involved in the altercation -- a woman wearing a white shirt and blue shorts and carrying an umbrella, and a shorter woman wearing a white shirt and carrying a backpack.  See June 26 Tr. at 22:11-16 (Court).

The Court said it would prepare findings of fact and conclusions of law based on the evidence presented and on the parties' arguments.  See June 26 Tr. at 22:23-25 (Court).  The United States and A. Jones said that the Court may prepare its own findings of fact instead of each party submitting proposed findings of fact to the Court.  See June 26 Tr. at 23:12-24:6 (Nayback, Court, Snyder).  A. Jones said that, if the Court concludes that A. Jones did not violate his

supervised release-conditions, then he could be released immediately.  See June 26 Tr. at 24:22-24 (Snyder).  A. Jones added that, if the Court concludes that A. Jones committed a Grade B Violation, then the sentencing range under the Guidelines is 8 to 14 months, and he has already served 12-and-a-half months.  See June 26 Tr. at 24:24-25:2 (Snyder).  Finally, according to A. Jones, if the Court concludes that he committed a Grade A Violation, then the sentencing range is 18 to 24 months under the Guidelines.  See June 26 Tr. at 25:2-4 (Snyder).  A. Jones argued that, "even if the Court finds that voluntary manslaughter was proven by a preponderance of the evidence," the Court "should vary from the guidelines based on time already served and that the defendant wasn't found guilty of manslaughter beyond a reasonable doubt."  June 26 Tr. at 25:4-9 (Snyder).  A. Jones further asserted that

> the high end of the guideline range and the maximum penalties should be reserved for the most egregious cases, and in this case, . . . if he had committed first degree murder or even pled to voluntary manslaughter, that's different than what you have before you to decide and sentence on.

June 26 Tr. at 26:14-20 (Snyder).  The Court said that, because A. Jones pled to involuntary manslaughter and his conduct resulted in a death, he is not inclined to conclude that there was no violation and, thus, will not release A. Jones immediately.  See June 26 Tr. at 25:23-26:6 (Court).  The Court further noted that it appears that A. Jones is "in the middle of the range of what he was going to plead to, [] and not that far off from the bottom of the range that probation and the Government have indicated would be appropriate here."  June 26 Tr. at 26:10-14 (Court).  The Court said that it would determine whether A. Jones' conduct constitutes a Grade A Violation or a Grade B Violation, and then it would sentence A. Jones.  See June 26 Tr. at 27:9-12 (Snyder, Court).  The Court noted, however, that, after it issues an opinion, "[i]f the plea offer is still on the table [A. Jones] may want to take it.  If it's not on the table then we'll proceed to sentencing with

the determination that I've made." June 26 Tr. at 27:14-17 (Court). The Court then concluded the

hearing. See June 26 Tr. at 27:22-28:7 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L.

No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory. In

excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act

intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous

factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the

past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at

261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2)

enumerates:

> (A)    to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective
> manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of

the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d at 1264. This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption" (emphasis in original); United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level"). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence. See Kimbrough v. United States, 552 U.S. at 90-

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker, 543 U.S. 220 (2005)], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges are advisory. The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-*Booker* have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines

91; Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

>        While the Supreme Court's decision in United States v. Booker has given the
> sentencing court discretion that it did not have earlier, the sentencing court's first
> task remains to accurately and correctly determine the advisory-guideline sentence.
> Thus, before the sentencing court takes up a defendant's Booker arguments, the
> sentencing court must first determine whether the defendant is entitled to downward
> departures.  The sentencing court may, however, also use these same departure
> factors in the Booker calculus, even if the court does not grant a downward
> departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13,

---

framework on the basis of the § 3553(a) factors taken as a whole.  The Court must
follow this sequence, because: (i) the Guidelines expressly provide for it, and courts
must still consult the Guidelines, even if they will subsequently vary from them in
the third step of the sequence; and (ii) adherence to this sequence is the only way
to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not
bound to apply the Guidelines, must consult those Guidelines and take them into
account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough
v. United States that "courts may vary [from the Guidelines ranges] based solely on
policy considerations, including disagreements with the Guidelines," 552 U.S. 85,
101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this
freedom could mean that a district court may excise individual portions of the
Guidelines along the way as it performs an otherwise by-the-book Guidelines
analysis, end up with a sentence with built-in variances, and never even know what
sentence a true, rigid Guidelines application would yield.  In practice, however,
appellate courts expect district courts to first obtain the true Guidelines' sentence
range and circumscribe their United States v. Booker-granted authority to post-
Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16
(2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic
sequence most likely acts procedurally unreasonably.  See Gall v. United States,
552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the
district court committed no significant procedural error, such as failing to calculate
(or improperly calculating) the Guidelines range, treating the Guidelines as
mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on
clearly erroneous facts, or failing to adequately explain the chosen sentence"
(emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. 2014)(Browning, J.).

2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51).

## LAW REGARDING SUPERVISED RELEASE REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 of Title 18 of the United States Code permits courts to revoke supervised release after concluding that the defendant violated a condition of probation by a preponderance of the evidence.  See 18 U.S.C. § 3583(e).  Section 3583(e)(3) sets forth the process for revoking supervised release:

(e)    Modification of conditions or revocation. -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

. . . .

(3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case. . . .

18 U.S.C. § 3583(e)(bold in original).  "Preponderance of the evidence" means:

The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.

- 65 -

"Preponderance of the Evidence," Black's Law Dictionary (10th ed. 2014).

"The Sixth Amendment [to the Constitution of the United States of America] is a trial right and does not apply to pretrial proceedings." United States v. Hernandez, 778 F. Supp. 2d 1211, 1225 (D.N.M. 2011)(Browning, J.). The Tenth Circuit has suggested that the Sixth Amendment applies only to trial proceedings. See United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006). But rule 32.1 of the Federal Rules of Criminal Procedure gives the defendant at the revocation hearing "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(c). The rule's notes instruct courts to apply a balancing test that weighs "the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it." Rule 32.1 Advisory Committee's Note to the 2012 Amendment. The Tenth Circuit has adopted this balancing test "when determining a releasee's confrontation rights at a revocation hearing." United States v. Jones, 818 F.3d at 1099. See United States v. Hernandez, 428 F. Supp. 3d at 788 ("When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness." (citing United States v. Jones, 818 F.3d at 1098)).

## ANALYSIS

The Court concludes that A. Jones committed a Grade A Violation under the Guidelines, because his conduct constitutes a crime of violence that is punishable by a term of imprisonment exceeding one year. See FOF ¶¶ 134-35, at 21. The Court also concludes that A. Jones did not stab Chavez in self-defense, because his conduct was not reasonable and was an excessive use of

force under the circumstances.  On September 7, 2018, A. Jones began serving a three-year term of supervised release.  See FOF ¶ 5, at 3.  A. Jones' supervised release conditions require, among other things, that he "not commit another federal, state or local crime."  Judgment at 3.  See FOF ¶ 5, at 4; 18 U.S.C. § 3563(a)(1) (stating that, if a district court imposes a term of supervised release after imprisonment, "[t]he court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision").  On June 7, 2019, exactly nine months into his supervised release term, A. Jones stabbed Chavez, resulting in Chavez' death.  See FOF ¶ 60, at 11.  According to Chavez' autopsy and pathology report, Chavez suffered "an injury to the upper right portion of his lung, and straight through the aorta."  June 15 Tr. at 26:19-20 (Lucero).  See FOF ¶ 100, at 16.  Although New Mexico initially charged A. Jones with murder, a Grand Jury indicted A. Jones for voluntary manslaughter, and A. Jones ultimately pled no contest to involuntary manslaughter.  See FOF ¶ 108, at 17.  A. Jones "admit[s] to violating a mandatory condition of his supervised release that he not commit another federal, state, or local crime," but he argues that the Court should concludes that he acted in self-defense and thus did not violate his supervised release conditions.  Jones Sentencing Memo at 1. See FOF ¶¶ 108-10, at 17.  Consequently, the primary issues are: (i) whether A. Jones' violation constitutes a Grade A Violation, a Grade B Violation, or a Grade C Violation under the Guidelines; and (ii) whether A. Jones acted in self-defense such that the Court should find that A. Jones did not violate his supervised release conditions.

I.      **A. JONES COMMITTED A GRADE A VIOLATION, BECAUSE A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT HIS CONDUCT CONSTITUTES VOLUNTARY MANSLAUGHTER UNDER NEW MEXICO LAW, WHICH THE GUIDELINES CATEGORIZE AS A CRIME OF VIOLENCE AND A GRADE A VIOLATION.**

The Guidelines provide the following definitions for the three grades of supervised release violations:

> (1)     GRADE A VIOLATIONS -- conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;

> (2)     GRADE B VIOLATIONS -- conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;

> (3)     GRADE C VIOLATIONS -- conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision.

U.S.S.G. § 7B1.1(a)(1)-(3).  See FOF ¶ 127, at 20.  Despite the discrepancies between the offense with which the New Mexico charged A. Jones, the offense for which a Grand Jury indicted A. Jones, and the offense to which A. Jones pled, see FOF ¶¶ 108-09, at 17, the Guidelines make clear that a defendant's "actual conduct" -- not the criminal charges against him -- is the key criterion for determining whether the defendant has violated a supervised release condition and, if so, a violation's grade, U.S.S.G. § 7B1.1 note 1.  Application note 1 to § 7B1.1 states:

> A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct.  The grade of violation does not depend upon the conduct that is the subject of criminal charges or of which the defendant is convicted in a criminal proceeding.  Rather, the grade of the violation is to be based on the defendant's actual conduct.

U.S.S.G. § 7B1.1 note 1.

The overwhelming evidence supports that A. Jones' conduct included stabbing Chavez

using a knife that A. Jones took from E. Jones, which caused Chavez to fall to the ground at the foot of a dumpster and subsequently die. See FOF ¶ 60, at 11 (citing Sonic East Video at 00:26-00:30; June 15 Tr. at 12:1-4 (Towne); id. at 13:3-8 (Towne); Bridges Witness Video at 00:00-00:01); FOF ¶ 85, at 12 (quoting June 15 Tr. at 25:8-26:6 (Lucero), and citing Lucero Investigation Report). The United States and A. Jones disagree whether A. Jones' conduct constitutes voluntary manslaughter, which is a third-degree felony, see N.M. Stat. Ann. § 30-2-3(A), or involuntary manslaughter, which is a fourth-degree felony, see N.M. Stat. Ann. § 30-2-3(B), both of which are punishable by a term exceeding one year, see N.M. Stat. Ann. § 31-18-15(A)(6) (prescribing six years imprisonment for a third-degree felony resulting in the death of a human being); N.M. Stat. Ann. § 31-18-15(A)(9) (prescribing eighteen months imprisonment for a fourth-degree felony). See also FOF ¶¶ 122-126, at 19; June 26 Tr. at 13:8-10 (Nayback)(arguing that A. Jones' conduct resembles "classic voluntary manslaughter"); June 26 Tr. at 17:5-7 (Snyder)(arguing that A. Jones committed "justifiable homicide and self-defense," and "at the very most involuntary manslaughter"). Accordingly, A. Jones' conduct constitutes an offense that is punishable by an imprisonment term exceeding one year, and, thus, A. Jones' violation is not a Grade C Violation. See FOF ¶ 132, at 21. Rather, the United States and A. Jones contest whether A. Jones' conduct constitutes a Grade A Violation or a Grade B Violation. See June 26 Tr. at 13:8-10 (Nayback); id. at 17:5-7 (Snyder).

    The relevant factors that distinguish a Grade A Violation from a Grade B Violation are that the former applies only if a defendant's conduct constitutes: (i) "a crime of violence"; (ii) "a controlled substance offense"; or (iii) an offense "involv[ing] possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a)." U.S.S.G. § 7B1.1(a)(1). See FOF ¶ 127, at 20. A. Jones' conduct is not a "controlled substance offense," and a knife is not a "firearm" or

"destructive device" under § 5845(a).[6]  U.S.S.G. § 7B1.1(a)(1).  A. Jones' violation therefore is a

Grade A Violation if his conduct constitutes a "crime of violence" under the Guidelines.  U.S.S.G.

---

[6]Section 5845(a) provides the following definition for "firearm":

> The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

26 U.S.C. § 5845(a).  For § 5845's purposes, a "destructive device" means:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10, United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845(f).

§ 7B1.1(a)(1).  See FOF ¶ 127, at 20.  The Guidelines define "crime of violence":

> (a)      The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that --
>
> > (1)      has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> >
> > (2)      is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a).  See FOF ¶ 131, at 20-21.  While the Guidelines explicitly list voluntary manslaughter as a crime of violence, the Guidelines do not identify involuntary manslaughter as a crime of violence.  See FOF ¶ 132, at 21.  Involuntary manslaughter is a crime of violence only if it "has as an element the use, attempted use, or threatened use of physical force against the person of another."  U.S.S.G. § 4B1.2(a)(1).  See FOF ¶ 131, at 20-21.  New Mexico law defines involuntary manslaughter as "manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection."  N.M. Stat. Ann. § 30-2-3(B).  See FOF ¶ 124, at 19.  Because New Mexico's involuntary manslaughter definition does not have "as an element the use, attempted use, or threatened use of physical force against the person of another," U.S.S.G. § 4B1.2(a)(1), involuntary manslaughter is not a crime of violence.  The determination whether A. Jones' conduct constitutes a crime of violence -- and, in effect, a Grade A Violation -- thus hinges on whether A. Jones' conduct amounts to voluntary manslaughter or involuntary manslaughter.

The Court finds by a preponderance of the evidence that A. Jones's conduct amounts to voluntary manslaughter, which is a crime of violence, and, therefore, A. Jones committed a Grade

A Violation when he stabbed and killed Chavez.  See FOF ¶¶ 134-35, at 21.  At the June 26, 2020, hearing, the United States asserted that it is "clear by a preponderance of the evidence is that the defendant stabbed and killed Mr. Chavez in a heat of passion," "[w]hich is classic voluntary manslaughter."  June 26 Tr. at 13:8-10 (Nayback).  The United States noted that A. Jones testified that his "adrenaline was going" during the altercation and "[t]hat is tantamount to heat of passion."  June 26 Tr. at 13:12-13 (Nayback).  The United States further argued that the video footage and evidence demonstrate by a preponderance of the evidence that A. Jones committed voluntary manslaughter.  See June 26 Tr. at 15:2-8 (Nayback).  A. Jones argued, however, that "[t]his case is justifiable homicide and self-defense" and "at the very most involuntary manslaughter."  June 26 Tr. at 17:5-7 (Snyder).  A. Jones noted that "[v]oluntary manslaughter results when a person knows their actions create a strong probability of death or great bodily harm, and it requires proof of criminal intent, general criminal intent to kill."   June 26 Tr. at 15:22-16:1 (Snyder).  A. Jones contended that "provocation in this case was absent," because the "evidence shows that he continually disengaged."  June 26 Tr. at 16:2-6 (Snyder).  A. Jones also emphasized that there "is no duty to retreat" under New Mexico law, and that, if A. Jones had gone to trial, the jury would have received a jury instruction about A. Jones' right to "stand his ground and defend himself."  June 26 Tr. at 16:19-23 (Snyder).  According to A. Jones, the United States "has not provided any evidence that Mr. Jones was not acting in self-defense."  June 26 Tr. at 16:25-17:1 (Snyder).

The Court finds that a preponderance of the evidence supports that A. Jones acted with a general criminal intent to stab and kill Chavez, an element that distinguishes voluntary manslaughter from involuntary manslaughter under New Mexico law.  See United States v. Serawop, 410 F.3d 656, 669 (10th Cir. 2005).  The Court reproduces below New Mexico law's definitions for both offenses.

| Voluntary Manslaughter | Involuntary Manslaughter |
|---|---|
| Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion.<br><br>Whoever commits voluntary manslaughter is guilty of a third degree felony resulting in the death of a human being.<br><br>N.M. Stat. Ann. § 30-2-3(A).  See FOF ¶ 123, at 19. | Involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection.<br><br>Whoever commits involuntary manslaughter is guilty of a fourth degree felony.<br><br>N.M. Stat. Ann. § 30-2-3(B).  See FOF ¶ 124, at 19. |

Voluntary manslaughter includes as an element that the defendant commit manslaughter[7] "upon a sudden quarrel or in the heat of passion," N.M. Stat. Ann. § 30-2-3(A) -- an element that involuntary manslaughter lacks, see N.M. Stat. Ann. § 30-2-3(B), but heat of passion is not the distinguishing element between the two offenses, cf. United States v. Serawop, 410 F.3d at 669 ("[H]eat of passion . . . is not the defining difference between voluntary manslaughter and involuntary manslaughter.").   In United States v. Serawop, the Tenth Circuit analyzed the common-law definitions for murder, voluntary manslaughter, and involuntary manslaughter, and it determined that "heat of passion is the defining difference between second degree murder and voluntary manslaughter." United States v. Serawop, 410 F.3d at 669.  The Tenth Circuit reasoned:

> "Voluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of the mental state that *would* constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation." . . . .  Thus, the only difference between second degree murder and voluntary manslaughter in the homicide hierarchy is that voluntary manslaughter is committed in the heat of passion, and the presence of this mitigating factor negates the malice that would otherwise attach given an intentional or reckless mental state.

---

[7]New Mexico law defines manslaughter as "the unlawful killing of a human being without malice."  N.M. Stat. Ann. § 30-2-3.  See FOF ¶ 122, at 19.

United States v. Serawop, 410 F.3d at 669 (quoting United States v. Browner, 889 F.2d 549, 553 (5th Cir. 1989)(emphasis in United States v. Serawop and United States v. Browner)(alteration and footnote omitted).  The Tenth Circuit explained, however, that "[b]oth voluntary manslaughter and involuntary manslaughter could take place in the heat of passion."  United States v. Serawop, 410 F.3d at 669.  While heat of passion distinguishes second-degree murder from voluntary manslaughter, "[t]he defining difference between voluntary and involuntary manslaughter is whether the defendant acted with intent to kill (as defined for second degree murder) or negligently or carelessly."  United States v. Serawop, 410 F.3d at 669.  Whereas voluntary manslaughter is a "general intent crime," United States v. Serawop, 410 F.3d at 666, "involuntary manslaughter requires only that [a] 'defendant's acts [] amount to gross negligence,'" United States v. Serawop, 410 F.3d at 666 n.7 (quoting United States v. Brown, 287 F.3d 965, 975 (10th Cir. 2002))(alterations added).

Although United States v. Serawop involved federal criminal statutes, New Mexico caselaw interpreting state criminal statutes manifests the same mens rea distinction between voluntary manslaughter and involuntary manslaughter that the Tenth Circuit underscored in United States v. Serawop.  Under New Mexico law, "voluntary manslaughter is a general intent crime." State v. Jernigan, 2006-NMSC-003, ¶ 18, 127 P.3d 537, 543 (citing State v. Beach, 1985-NMSC-043, ¶ 11, 699 P.2d 115, 118).  A general intent crime "requires only a 'conscious wrongdoing,' or 'the purposeful doing of an act that the law declares to be a crime.'" State v. Brown, 1996-NMSC-073, ¶ 22, 931 P.2d 69, 74 (quoting State v. Ibn Omar-Muhammad, 1985-NMSC-006, ¶ 20, 694 P.2d 922, 926).  In contrast, to convict of involuntary manslaughter, "'the State must show at least criminal negligence to convict.'" State v. Suazo, 2017-NMSC-011, ¶ 24, 390 P.3d 674, 682 (quoting State v. Yarborough, 1996-NMSC-068, ¶ 20, 930 P.2d 131, 138).  "Criminal

negligence has been defined as including 'conduct which is reckless, wanton, or willful.'"  State v. Mascarenas, 2000-NMSC-017, ¶ 9, 4 P.3d 1221, 1224 (quoting State v. Arias, 1993-NMCA-007, ¶ 8, 847 P.2d 327, 330, and citing State v. Harris, 1937-NMSC-046, 70 P.2d 757, 757).  See State v. Sisneros, 1938-NMSC-049, ¶ 30, 82 P.2d 274, 280 (concluding that the statutory phrase "without due caution and circumspection" equated to "criminal negligence" at common law).

The Court concludes that a preponderance of the evidence supports that A. Jones' conduct constitutes voluntary manslaughter, because the group of people chasing A. Jones and E. Jones sufficiently provoked A. Jones to act in a heat of passion, and because A. Jones intended to disable Chavez by stabbing him.  See FOF ¶ 134, at 21.  New Mexico's Criminal Uniform Jury Instructions for voluntary manslaughter require the State to prove that: (i) the defendant killed the victim; (ii) the "defendant knew that his acts created a strong probability of death or great bodily harm" to the victim or another human being; (iii) the "defendant acted as a result of sufficient provocation"; and (iv) the act happened in New Mexico.  N.M. R. Ann. Crim. U.J.I. 14-221.  See FOF ¶ 127, at 20; Sarracino v. United States, No. CIV 16-0734 MCA/CG, 2017 WL 3098262, at *9 (D.N.M. 2017)(Garza, M.J.).  Moreover,

> [s]ufficient provocation can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions.  The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition.  The "provocation" is not sufficient if an ordinary person would have cooled off before acting.

N.M. R. Ann. Crim. U.J.I. 14-222.  See FOF ¶ 128, at 20; Sells v. State, 1982-NMSC-125, ¶ 5, 653 P.2d 162, 163 (same).

The circumstances surrounding A. Jones' encounter with Chavez support that A. Jones acted in a heat of passion as a result of sufficient provocation.  First, Chavez and the unknown

woman with the umbrella were the initial aggressors, and there are no facts that would indicate that A. Jones planned the altercation.  See FOF ¶ 96, at 15.  Furthermore, throughout the entire encounter, A. Jones and E. Jones were outnumbered, and there are no facts indicating that A. Jones escalated the situation before he stabbed Chavez.  See FOF ¶¶ 97-99, at 16.  The unknown woman hit A. Jones on the sidewalk in front of Sonic, called A. Jones names, pointed her finger in E. Jones' face, and later swung her umbrella at A. Jones.  See FOF ¶¶ 21, 26, 35, at 6, 7, 8. A. Jones repeatedly tried to leave the situation, but Chavez and the unknown woman blocked A. Jones from leaving the sidewalk in front of Sonic, and they followed A. Jones and E. Jones when they headed around to Sonic's backside.  See FOF ¶¶ 25, 32, 44, 52, at 7, 8, 9, 10.  A. Jones testified that one man who followed him had a cane that he swung at A. Jones, and a small woman tried to stab him with a knife that she held in her hand.  See FOF ¶ 46, at 9.  When A. Jones and E. Jones ran to Sonic's backside, a person yelled, "Shoot him," FOF ¶ 57, at 11, and other people shouted, "Fuck him, get him, fuck him, get him," FOF ¶ 56, at 10.  Chavez chased A. Jones with an umbrella, see FOF ¶ 55, at 10, and A. Jones feared for his life, because he did not know if one of the people following him had a gun, see FOF ¶ 62, at 11.  When A. Jones and Chavez arrived near the dumpsters behind Sonic, Chavez approached A. Jones from the side, and A. Jones was "afraid [Chavez] was going to block his flight from that scene."  FOF ¶ 58, at 11.  A. Jones thought that Chavez might be under the influence of drugs, see FOF ¶ 41, at 9, and Chavez' toxicology report later disclosed that Chavez' blood contained traces of over half a dozen drugs, see FOF ¶ 104, at 16-17.  Expert witness evidence supports that, when most people are confronted with a high-stress situation with few options for responding, they focus on the immediate threat and are less able to process and respond to external stimuli in a reasonable, controlled manner.  See FOF ¶¶ 114, 118, 119, at 18, 19.  Moreover, it is often more difficult to de-escalate a tense situation

involving a person who is under the influence of drugs or alcohol.  See FOF ¶ 115, at 18.  These factual findings paint a situation marked by "rage, fear, . . . terror or other extreme emotions." N.M.R.A. Crim. U.J.I. 14-222.  The verbal and physical threats levied against A. Jones would affect an ordinary person's "ability to reason" and would "cause a temporary loss of self control in an ordinary person of average disposition."  N.M.R.A. Crim. U.J.I. 14-222.  The entire encounter -- from the moment A. Jones and E. Jones approached the unknown woman on the sidewalk in front of Sonic to the moment A. Jones stabbed Chavez near the dumpsters behind Sonic -- lasted only about four minutes.  An ordinary person would not be able to cool off before responding under such high-stress circumstances in which one's safety and wellbeing are on the line.  See State v. Abeyta, 1995-NMSC-051, ¶ 15, 901 F.2d 164, 177 ("New Mexico has long recognized that 'heat of passion' includes fear for one's own safety that may result in an unreasonable belief in the need to defend oneself." (quoting N.M. Stat. Ann. § 30-2-3(A)), abrogated on other grounds by State v. Campos, 1996-NMSC-043, 921 P.2d 1266.  Accordingly, the Court concludes that A. Jones stabbed Chavez in a heat of passion in response to sufficient provocation.

As discussed above, heat of passion distinguishes murder from voluntary manslaughter, but its presence does not negate a finding that a defendant's conduct constitutes involuntary manslaughter.   A. Jones' conduct and the circumstances that he faced satisfy voluntary manslaughter's heat-of-passion element under New Mexico law, so the evidence does not support that he committed second-degree murder.[8]  See State v. Abeyta, 1995-NMSC-051, ¶ 20, 901 P.2d

---

[8]At the June 26, 2020, hearing, A. Jones contended that "provocation in this case was absent," because the "evidence shows that he continually disengaged."  June 26 Tr. at 16:2-6 (Snyder).  For the reasons discussed above, the preponderance of the evidence indicates that the group of people that chased and threatened A. Jones sufficiently provoked him by escalating the tension between A. Jones and the group of people and by preventing A. Jones from walking away. That A. Jones made several failed attempts to leave the group of people does not change the

Case 1:13-cr-02869-JB   Document 145   Filed 08/03/20   Page 78 of 88

at 172 ("Under our statutory construction of voluntary manslaughter, sufficient provocation arising from fear for one's own safety only mitigates murder to voluntary manslaughter, not involuntary manslaughter.").  Voluntary manslaughter is a "general intent crime," State v. Jernigan, 2006-NMSC-003, ¶ 18, 127 P.3d at 543 (citing State v. Beach, 1985-NMSC-043, ¶ 11, 699 P.2d at 118), and "[t]he mens rea required for voluntary manslaughter is that a defendant intended to cause the harmful act," State v. Abeyta, 1995-NMSC-051, ¶ 24, 901 P.2d at 173.  To support a voluntary manslaughter conviction, the New Mexico Criminal Uniform Jury Instructions require that a jury find that the "defendant knew that his acts created a strong probability of death or great bodily harm" to the victim or another human being.  N.M. R. Ann. Crim. U.J.I. 14-221.  See FOF ¶ 127, at 20.  Hence, the conclusion "[t]hat an accidental killing will not support a conviction of voluntary manslaughter," the Supreme Court of New Mexico notes, "goes without saying."  State v. Lopez, 1968-NMSC-092, ¶ 14, 442 P.2d 594, 597.

An accidental killing "might," however, "give rise to the need for an involuntary manslaughter instruction."  State v. Abeyta, 1995-NMSC-051, ¶ 27, 901 P.2d at 174.  To convict

---

Court's finding that the encounter's circumstances sufficiently provoked A. Jones to act, thus satisfying voluntary manslaughter's heat-of-passion element.  The Court further notes that A. Jones' assertion that sufficient provocation is lacking would not necessarily point toward a finding that his conduct constitutes involuntary manslaughter.  Committing an act in a heat of passion as a result of sufficient provocation is not necessary to conclude that a defendant committed involuntary manslaughter, but nor does it preclude such a conclusion.  See United States v. Serawop, 410 F.3d at 669.  A lack of sufficient provocation would preclude the Court from concluding that A. Jones committed voluntary manslaughter, but whether A. Jones' conduct constitutes second-degree murder would be back on the table, because "[t]he difference between second degree murder and voluntary manslaughter is sufficient provocation."  N.M. R. Ann. Crim. U.J.I. 14-221 cmt. (citing State v. Gaitan, 2002-NMSC-007, ¶ 11, 42 P.3d 1207, 1211).  The New Mexico Criminal Uniform Jury Instructions explain that "manslaughter is essentially second degree murder committed under sufficient provocation.  To make a case of manslaughter, the state must prove all of the essential elements of second degree murder plus the additional element of sufficient provocation."  N.M. R. Ann. Crim. U.J.I. 14-221 cmt.

- 78 -

a defendant of involuntary manslaughter, "'the State must show at least criminal negligence.'" State v. Suazo, 2017-NMSC-011, ¶ 24, 390 P.3d 674, 682 (quoting State v. Yarborough, 1996-NMSC-068, ¶ 20, 930 P.2d 131, 138).  "The showing of criminal negligence required for an involuntary manslaughter jury instruction includes the concept of recklessness, in which a defendant 'consciously disregards a substantial and unjustifiable risk' that harm will result from his conduct."  State v. Henley, 2010-NMSC-039, ¶ 16, 237 P.3d 103, 107 (quoting Model Penal Code § 2.02(c)).  The New Mexico Criminal Uniform Jury Instructions' criminal negligence instruction "incorporates this definition," State v. Henley, 2010-NMSC-039, ¶ 16, 237 P.3d at 107 (citing N.M. R. Ann. Crim. U.J.I. 14-133), and the involuntary manslaughter instruction provides that the State must prove that the defendant: (i) "should have known of the danger involved by [the defendant's] actions"; and (ii) "acted with a willful disregard for the safety of others," N.M. R. Ann. Crim. U.J.I. 14-231.  See FOF ¶ 129, at 20.

The preponderance of the evidence supports that A. Jones intended to cause a harmful act, because he knew that stabbing Chavez would create a strong probability of death or great bodily harm to Chavez.  A. Jones' conduct thus satisfies voluntary manslaughter's mens rea element.  First, there are no facts indicating that A. Jones stabbed Chavez by accident.  When A. Jones and E. Jones ran from the sidewalk in front of Sonic to the dumpster behind Sonic, A. Jones deliberately took E. Jones' knife away from him.  See FOF ¶¶ 47-48, at 10.  A. Jones testified that he took the knife "to let [the other people] know that we're not trying to pose a threat or anything like that," and "to diffuse [the] situation," June 15 Tr. at 76:11-16 (A. Jones), but he nevertheless used the knife to stab and kill Chavez, see FOF ¶ 60, at 11.  A. Jones intentionally used the knife to disable Chavez out of "fear" and in an effort to "get away."  June 15 Tr. at 91:24-92:8 (A. Jones, Nayback).  See FOF ¶ 61, at 11.  That A. Jones knew that stabbing Chavez in the chest would

create a strong probability of death or great bodily harm is irrefutable.  A. Jones is no stranger to

stabbings.  On December 3, 2013, A. Jones pled guilty to stabbing a person with a screwdriver and

stabbing another person with a knife, see Plea Agreement ¶¶ 10, 12, at 4-5, and Chief Judge Armijo

subsequently sentenced A. Jones to 70 months imprisonment followed by three years of supervised

release, see Sentencing Minute Sheet at 1.  See also FOF ¶¶ 108-09, at 17.  Nine months into his

supervised release term, A. Jones found himself in a situation that ended with him yet again

stabbing a person with knife.  Minutes after stabbing Chavez, when a police officer stopped and

arrested A. Jones and E. Jones, A. Jones "pushed the knife aside," because he did not "want to get

caught holding the knife."  June 15 Tr. at 81:25-82:1 (A. Jones).  See FOF ¶ 72, at 12.  The Court

thus concludes that A. Jones possessed the requisite general criminal intent to establish that his

conduct constitutes voluntary manslaughter.

At the May 14, 2020, hearing, A. Jones argued that he had no intent to kill Chavez.  See

May 14 Tr. at 22:13-14 (Snyder).  A. Jones later asserted that he "displayed no intent to engage in

a confrontation that could lead to violence."  June 26 Tr. at 18:23-19:1 (Snyder).  A. Jones'

arguments obscure, however, the difference between general intent crimes and specific intent

crimes.  The Supreme Court of New Mexico clarifies this difference:

> "When the definition of a crime consists of only the description of a particular
> act, without reference to intent to do a further act or achieve a further
> consequence, we ask whether the defendant intended to do the proscribed act.
> This intention is deemed to be general criminal intent.  When the definition refers
> to defendant's intent to do some further act or achieve some additional
> consequence, the crime is deemed to be one of specific intent."

State v. Beach, 1985-NMSC-043, ¶ 11, 699 P.2d at 117 (quoting State v. Bender, 1978-NMSC-

044, ¶ 7, 579 P.2d 796, 797).  As already noted, voluntary manslaughter is a general criminal intent

crime, and, "by statutory definition, [it] do[es] not contain an element of intent to do a further act

or achieve a further consequence. . . . [It] contain[s] only a knowledge element -- the defendant's knowledge that his acts create a strong probability of death or great bodily harm." State v. Beach, 1985-NMSC-043, ¶ 11, 699 P.2d at 118. In State v. Abeyta, the Supreme Court of New Mexico overruled State v. Arias, 1993-NMCA-007, 847 P.2d 327, in which the Court of Appeals of New Mexico held that, to support a voluntary manslaughter conviction, "a defendant must intend not just the harm that caused the death but must also intend the victim's death in order to find voluntary manslaughter." State v. Abeyta, 1995-NMSC-051, ¶ 24, 901 P.2d at 173. The Supreme Court of New Mexico held that a defendant need not have intended to kill a person to commit voluntary manslaughter. See State v. Abeyta, 1995-NMSC-051, ¶ 24, 901 P.2d at 173 (holding that the Court of Appeals of New Mexico's reasoning that voluntary manslaughter is a specific intent crime which requires an "intent to kill" "is contrary to clear precedent defining the necessary mens rea for voluntary manslaughter"). Accordingly, whether A. Jones intended for his stabbing to kill Chavez is beside the point -- to find that A. Jones' possessed the necessary mens rea to commit voluntary manslaughter, all that the Court must determine is whether A. Jones knew that stabbing Chavez would create a strong probability that Chavez would die or sustain great bodily harm. See FOF ¶ 127, at 20. The Court concludes that A. Jones possessed the requisite knowledge, and that, thus, A. Jones' conduct constitutes voluntary manslaughter. See FOF ¶¶ 134-34, at 21.

## II.    A. JONES' SELF-DEFENSE ARGUMENT IS INADEQUATE, BECAUSE THE PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT STABBING CHAVEZ IN THE CHEST WAS AN EXCESSIVE USE OF FORCE AND THAT A REASONABLE PERSON FACING THE SAME CIRCUMSTANCES WOULD NOT HAVE REACTED SIMILARLY TO A PERSON CHASING HIM OR HER WITH AN UMBRELLA.

Although A. Jones admits in the Jones Sentencing Memo that he violated a supervised release condition, see Jones Sentencing Memo at 1, A. Jones argued at the evidentiary hearings

that the Court should conclude that he did not violate a supervised release condition, because he

committed "justifiable homicide" and acted in "self-defense," June 15 Tr. at 60:7-17 (Snyder).

See June 26 Tr. at 17:5-7 (Snyder).  A. Jones pled no contest to involuntary manslaughter in state

court to avoid the risk of a lengthier sentence if a jury convicted him of voluntary manslaughter,

see FOF ¶¶ 108-09, at 17, but A. Jones gives several reasons why the Court should conclude that

he acted in self-defense: (i) he was not the initial aggressor; (ii) he made four or five attempts to

exit the situation; (iii) witnesses heard threats that were directed toward him; (iv) he and E. Jones

were outnumbered; and (v) one of the men following him had a black cane, see June 15 Tr.

at 60:17-62:6 (Snyder).  The USPO acknowledges that A. Jones may have a self-defense claim

and that he was outnumbered, but the USPO argues that "there were other opportunities to get out

of the situation and they were not taken and the fact that it appeared the knife was already out well

before stabbing" indicates that there was "some premeditation but some willingness to help himself

in any way possible."  May 14 Tr. at 14:24-15:4 (Towne).

　　　　The Court concludes that the preponderance of the evidence does not support A. Jones'

self-defense argument.  Under New Mexico law,

> [s]elf-defense is a justification to all homicides and results in acquittal rather
> than mitigation.  The requirements of self-defense are (1) an appearance of
> immediate danger of death or great bodily harm to the defendant, (2) the defendant
> was in fact put in fear by the apparent danger, and (3) a reasonable person in the
> same circumstances would have reacted similarly. . . .  In addition, the claim of self-
> defense may fail if the defendant was the aggressor or instigator of the conflict, . . .
> or if the Defendant uses excessive force in response to the threat.

State v. Abeyta, 1995-NMSC-051, ¶ 14, 901 P.2d at 170-71 (citing State v. Martinez, 1981-

NMSC-016, ¶ 4, 622 P.2d 1041, 1043; State v. Chavez, 1983-NMCA-037, ¶ 5, 661 P.2d 887, 889).

Moreover, "[w]here a defendant presents sufficient evidence to support a theory of self-defense, it

raises a question of fact for the jury to resolve."  State v. Abeyta, 1995-NMSC-051, ¶ 17, 901 P.2d

at 171.  If the jury rejects the defendant's self-defense theory, the jury "may still find the defendant

acted under provocation of fear and may mitigate the charge of murder to the lesser charge of

voluntary manslaughter."  State v. Abeyta, 1995-NMSC-051, ¶ 17, 901 P.2d at 171 (citing Leo M.

Romero, Sufficiency of Provocation for Voluntary Manslaughter in New Mexico: Problems in

Theory and Practice, 12 N.M. L. Rev. 747, 766-67 (1982)).

Voluntary manslaughter's sufficient-provocation requirement -- "any action, conduct or

circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme

emotions," N.M. R. Ann. Crim. U.J.I. 14-222 -- partly resembles self-defense's requirement that

a defendant confronted "an appearance of immediate danger of death or great bodily harm," State

v. Abeyta, 1995-NMSC-051, ¶ 14, 901 P.2d at 170.  The Supreme Court of New Mexico counsels,

however, "that the 'critical difference between self-defense and voluntary manslaughter lies not in

provocation or the emotion of fear, but rather in the reasonableness of the defendant's conduct in

killing.'"  State v. Abeyta, 1995-NMSC-051, ¶ 17, 901 P.2d at 171 (quoting Romero, supra

at 770).  In State v. Melendez, 1982-NMSC-039, ¶ 9, 643 P.2d 607, 609, the Supreme Court of

New Mexico elaborated on the difference between self-defense to homicide and sufficient

provocation supporting a voluntary manslaughter conviction:

> "[W]hen facts are present which give rise to a plea of self-defense, it is not
> unreasonable that if the plea fails, the accused should be found guilty of voluntary
> manslaughter."  State v. Lopez, [1968-NMSC-092, ¶ 13,] 442 P.2d 594, 597 . . . .
> The underlying rationale for this principle of law stems from the difference between
> self-defense and provocation supporting a conviction for voluntary manslaughter.
> Self-defense is a belief by a *reasonable man* in the necessity to save himself from
> death or great bodily harm.  State v. Kidd, [1917-NMSC-056, ¶ 5, 175 P. 772, 774].
> Provocation supporting a conviction for voluntary manslaughter, on the other hand,
> is an act "committed under the influence of an *uncontrollable fear of death* or great
> bodily harm, caused by the circumstances, but without the presence of all the
> ingredients necessary to excuse the act on the ground of self-defense".  [State v.
> Kidd, 1917-NMSC-056, ¶ 5], 175 P. at 774. . . .  The two principles of law are
> therefore not mutually incompatible.

State v. Melendez, 1982-NMSC-039, ¶ 9, 643 P.2d at 609 (first alteration added in State v. Melendez)(emphasis in State v. Melendez and not in State v. Kidd).   When a jury rejects a defendant's self-defense argument as unreasonable but finds that the defendant's belief in the need for self-defense was the result of sufficient provocation, New Mexico courts sometimes refer to the defendant's self-defense argument as "imperfect self-defense."   State v. Abeyta, 1995-NMSC-051, ¶ 17, 901 P.2d at 171 ("[T]he unreasonable belief in the need for self-defense may well be termed imperfect self-defense . . . .   Such conduct is not a true defense and does not justify the killing.   Rather, the claim of imperfect self-defense simply presents an issue of mitigating circumstances that may reduce murder to manslaughter.").

A. Jones' use of force was unreasonable and excessive, and thus his self-defense argument is invalid, or rather, imperfect.   The Supreme Court of New Mexico has held that "[s]elf-defense is only a justification for a killing, and thus a lawful act, if all the elements necessary for self-defense are met.   One requirement of self-defense is that the force used must be reasonable in relation to the threat."   State v. Abeyta, 1995-NMSC-051, ¶ 23, 901 P.2d at 172 (citing State v. McLam, 1970-NMCA-129, ¶ 6, 478 P.2d 570, 572).   When A. Jones stabbed Chavez, A. Jones' movement was not blocked, because he faced Chavez and A. Jones' back faced the open air.   See FOF ¶ 60, at 11.   The evidence overwhelmingly supports that the group of people ran toward the dumpsters behind Sonic, and, when Chavez was only a few feet from the trash dumpster with his back facing the dumpster, A. Jones charged several feet toward Chavez and stabbed him.   See FOF ¶ 60, at 11 (citing Sonic East Video at 00:26-00:30; June 15 Tr. at 12:1-4 (Towne); id. at 13:3-8 (Towne); Bridges Witness Video at 00:00-00:01).   Unlike Chavez, A. Jones was not backed up against a dumpster, a wall, or any other object that would impede his movement, and A. Jones

deliberately moved toward Chavez in the seconds preceding the stabbing.  See FOF ¶ 60, at 11.
Because Chavez' back faced the dumpster and Chavez was the closest person to the dumpster at
only a few feet at most, Chavez' movement was more restricted than A. Jones' movement.
Leading up to the stabbing, people shouted, "[f]uck him, get him," June 15 Tr. at 19:22 (Snyder);
see FOF ¶ 57, at 11, and "shoot him," June 15 Tr. at 107:8-12 (Snyder, A. Jones); see FOF ¶ 56,
at 10, but there is no evidence indicating that Chavez vocalized that he would shoot or kill
A. Jones.  There is also no evidence that Chavez or any of the people chasing A. Jones and E. Jones
possessed a firearm -- A. Jones only feared that one of the people might have a gun.  See FOF
¶¶ 62, 66, at 10, 11.  At the moment that A. Jones stabbed Chavez, Chavez held an umbrella in his
hand, but Chavez had not used the umbrella to physically attack A. Jones.  See FOF ¶ 60, at 11.
Although Chavez could have injured A. Jones' eye with the umbrella, see FOF ¶ 40, at 9, it was
not reasonable for A. Jones to charge toward Chavez and stab him in the chest.

Dr. DiVasto testified that, during short, high-stress encounters, people are "less able . . . to
formulate a plan [and] less able . . . to incorporate what's happened and deal with it and come up
with alternatives." June 15 Tr. at 128:4-6 (DiVasto).  See FOF ¶ 114, at 18.  The Court concludes,
however, that, even in high-stress encounters, there are limits to what is reasonable.  A reasonable
person who is being chased by a person with an umbrella outside a public establishment would not
react by stabbing the person in the heart.  A. Jones could have continued to run away, gone inside
the Sonic, or used less force, but he instead escalated the altercation by charging toward Chavez
and stabbing him in the chest.  A. Jones' statements following the altercation implicitly
acknowledge that the circumstances did not require him to stab Chavez -- A. Jones denied being
involved in the physical altercation while simultaneously arguing that he acted in self-defense.

See FOF ¶ 93, at 15.  Both of these arguments cannot be true, and this contradiction casts additional doubt on the sincerity of A. Jones' testimony and the reasonableness of his self-defense argument.

Furthermore, A. Jones' response to the apparent danger he faced is an excessive use of force under the circumstances.  Whereas an act that meets all necessary elements for self-defense is a justifiable "killing, and thus a lawful act," "[t]he use of excessive force in self-defense renders the entire action unlawful."  State v. Abeyta, 1995-NMSC-051, ¶ 23, 901 P.2d at 172.  The Supreme Court of New Mexico has reasoned that "[t]he line of demarcation between a homicide which amounts to voluntary manslaughter and one which amounts to justifiable homicide in self-defense, is not always clearly defined and depends upon the facts of each case as it arises." State v. Kidd, 1917-NMSC-056, ¶ 5, 175 P. at 774.  Here, the facts indicate that A. Jones' conduct amounts to voluntary manslaughter and not to justifiable homicide in self-defense.  Although Chavez and the unknown woman with the umbrella were the initial aggressors, see FOF ¶ 96, at 15, A. Jones charged several steps toward Chavez moments before stabbing him in the chest, see FOF ¶ 60, at 11.  When A. Jones stabbed Chavez, Chavez was holding an umbrella that was approximately twenty to a little over twenty-four inches long.  See FOF ¶ 18, at 6.  At the June 15, 2020, hearing, A. Jones emphasized that umbrellas can be used as dangerous weapons, and some online retailers sell "security umbrellas" that can be used as weapons.  June 15 Tr. at 35:24-36: (Snyder, Lucero).  The Court finds that a preponderance of the evidence supports that A. Jones' stabbing was an excessive use of force in response to Chavez following A. Jones with an umbrella. There is no evidence suggesting that Chavez' umbrella could be used to seriously injure or kill A. Jones, or that A. Jones thought that Chavez' umbrella could be used to hurt him.  Moreover, A. Jones stabbed Chavez "straight through the aorta."  June 15 Tr. at 26:19-20 (Lucero).  See FOF ¶ 100, at 16.  Even if stabbing Chavez with a knife to disable could be a reasonable use of force

given the circumstances, stabbing Chavez in the chest and near his heart was not reasonable or commensurate with the circumstances.  At the time of the incident, A. Jones was serving a three-year term of supervised release after having gone to prison for stabbing one person with a screwdriver and stabbing another person with a knife.  See FOF ¶¶ 1-5, at 3-4.  Both victims suffered serious injuries, but neither of the two victims died.  See Plea Agreement ¶¶ 8-16, at 3-5. In contrast, Chavez died within minutes of A. Jones stabbing him.  Because stabbing Chavez in the chest was both unreasonable and an excessive use of force, the Court concludes that A. Jones has not satisfied the elements necessary to establish self-defense.

The Court concludes that A Jones' conduct is a Grade A Violation under the Guidelines, because A. Jones' conduct amounts to voluntary manslaughter under New Mexico law, which is a crime of violence under the Guidelines.  Furthermore, the preponderance of the evidence does not support that A. Jones acted in self-defense such that the Court should find that he did not violate a supervised release condition.  With a Grade A Violation and a criminal history category of III, see USPO Sentencing Memo at 2, the Guidelines recommend an imprisonment range of eighteen to twenty-four months, see U.S.S.G. § 7B1.4(b).  A. Jones was taken into custody on June 7, 2019, shortly after he stabbed Chavez, and, thus, as of August 1, 2020, he has been in custody for nearly fourteen months.

**IT IS ORDERED** that: (i) the Petition for Revocation of Supervised Release, filed June 10, 2019 (Doc. 115), alleges a Grade A Violation; (ii) Defendant Aldo Jones' conduct constitutes voluntary manslaughter, which is a Grade A Violation; (iii) A. Jones violated a state law and thus violated his supervised release conditions; and (iv) A. Jones' imprisonment range under the United States Sentencing Guidelines is 18 to 24 months.

UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Kyle T. Nayback
Paul H. Spiers
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Thomas B. Jameson
Daniel Benjamin Snyder
  Assistant Federal Public Defenders
Albuquerque, New Mexico

    *Attorneys for the Defendant*